

# In the
# Missouri Court of Appeals
## Western District

GAIL AND DARRELL MANSFIELD, )
　)
　　　　　Respondents, ) WD76310
　)
v. ) OPINION FILED:  June 17, 2014
　)
CALEB HORNER AND JOHN )
HORNER, )
　)
　　　　　Appellants. )

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Marco A. Roldan, Judge

Before Division Three:  Mark D. Pfeiffer, Presiding Judge, Thomas H. Newton, Judge
and Cynthia L. Martin, Judge

Caleb Horner ("Caleb") and John Horner ("John") (collectively "the Horners")

appeal from the trial court's judgment ("Judgment") in a wrongful death action awarding

$8,650,000 of compensatory damages and $100,000,000 in damages for aggravating

circumstances to Gail Mansfield ("Gail") and Darrell ("Darrell") Mansfield (collectively

"the Mansfields").[1]  The Horners present nine points on appeal, each of which argues that

the Judgment constituted error in that: (1) the Mansfields failed to make a submissible

---

[1]Because Caleb Horner and John Horner share the same surname, we refer to each by their first name for purposes of clarity.  The same is true for Gail Mansfield and Darrell Mansfield.  No familiarity or disrespect is intended with respect to any of the parties.

case on the duty and causation elements of their claim for wrongful death based on negligence; (2) the jury's verdict awarding $108,650,000 to the Mansfields was not supported by substantial evidence; (3) the jury's verdict awarding $108,650,000 to the Mansfields violated the Horners' constitutional right to due process; (4) the Mansfields' lawsuit against the Horners violated the Horners' constitutional right to religious freedom in that the lawsuit required the jury to address the merits of the Horners' religious beliefs; (5) Wendi Nield should have been allowed to testify; (6) Karen Tadych's testimony should have been excluded as irrelevant; (7) certain pieces of evidence should not have been excluded from trial for the Horners' failure to follow discovery rules; (8) the Mansfields' counsel intentionally inflamed the prejudices of the jury and misstated the law and the evidence during closing arguments; and (9) the Horners' motion for remittitur should have been granted because Missouri's statutory cap on punitive damages applies to limit the damages recoverable for aggravating circumstances in cases involving wrongful death. We affirm.

## Factual and Procedural Background[2]

Misty Mansfield[3] ("Misty"[4]) worked as a dispatcher for the Lee's Summit Police Department from 2001 to 2006. Caleb worked as a police officer for the Lee's Summit

---

[2]We view the facts in the light most favorable to the jury's verdict. *Mengwasser v. Anthony Kempker Trucking, Inc.*, 312 S.W.3d 368, 370 n.1 (Mo. App. W.D. 2010).

[3]There is a dispute between the parties as to Misty's last name at the time of her death. The dispute arises from the parties' disagreement as to whether the marriage between Misty and Caleb was valid. *See infra* note 5. Because the trial court referred to her as "Misty Mansfield" throughout its Judgment, we have elected to use that name.

[4]Because Misty Mansfield shares a last name with her parents, Gail and Darrell Mansfield, we refer to Misty by her first name for purposes of clarity. No familiarity or disrespect is intended.

2

Police Department during the same time period. Caleb and Misty began seeing one another romantically and eventually married in 2004.[5]

Caleb participated in a religious group led by John. According to the teachings of this group, a wife was to be submissive to her husband, which required the wife to relent to the husband's decisions. In addition, the group practiced "faith healing" rather than pursuing modern medical care. Though Misty had not participated in Caleb's religious group before she and Caleb started dating, she was generally aware of the group's teachings before she married Caleb.

Prior to their marriage, Caleb and Misty agreed that any children would be delivered at home without professional medical intervention. Misty discovered that she was pregnant in March 2006. While she was pregnant, Misty attended a course that taught the Bradley Method, a series of natural childbirth techniques. Misty went into labor on December 2, 2006, and she, along with Caleb, followed through with their plan for a home birth.

Misty went into labor on December 2, 2006, but did not deliver her baby until December 8, 2006. Throughout labor, Misty's "birth team" was present: Caleb, Amber Leathers ("Leathers"), Wendi Nield ("Nield"), and Tina Moore ("Moore"). Leathers and Nield are Caleb's sisters. The Horners represented to Misty that Leathers and Nield were midwives. Moore was Misty's best friend.

---

[5]The parties dispute whether Misty and Caleb were "married." According to the testimony at trial, Caleb and Misty participated in a marriage ceremony but never obtained a license from the State of Missouri. The validity of Caleb and Misty's purported marriage is not relevant to this appeal.

At some point during her labor, Misty contacted Amber Walla ("Walla"), a doula,[6] and asked Walla to come to the house. Upon learning how long Misty had been in labor and that the delivery was an "unassisted home birth," Walla was reluctant to go to the house. Walla eventually agreed to do so "as a friend" and made it clear to Misty and her birth team that she was not there "as a professional in any aspect."

Walla observed the shape of Misty's abdomen and noticed that it was "unusually shaped, like a big ball up under her ribs." Walla also performed a pelvic exam, during which she observed vaginal swelling and discovered what appeared to be meconium on her finger. Based on that information, Walla told Caleb, Leathers, and Nield that she believed the baby was in the breech position and that the situation was dangerous. Leathers and Nield argued that it was impossible for the baby to be in the breech position due to the "unity" between Caleb and Misty. According to their beliefs, "if the baby's husband and wife are in unity together, the baby will be head down."

During Walla's visit, Misty agreed to go to the hospital. Misty stood up from the bed and was in the process of putting on her clothes so that she could leave. At that point, Caleb asked Walla to leave the room so that he and Misty could pray together. Soon thereafter, Caleb emerged from the bedroom and told Walla that he and Misty had changed their minds. Caleb said, "[Walla], we're not ready to give up on this yet. We're just -- we think it's early labor and, um, you know, my sister has said that she's had labors like this before and they've had meconium like that before and, you know, we think

_____

[6]A doula is a "person, usually a woman, who is professionally trained to assist a woman during childbirth and who may provide support to the family after the baby is born." NEW OXFORD AMERICAN DICTIONARY 507 (2d ed. 2005).

everything's going to be fine. We're just not ready to go to the hospital." Caleb admitted that in his private conversation with Misty, he said, "Honestly, they're probably going to cut you open and take your baby."

On December 8, 2006, the baby began to descend. The baby was in fact breech. The baby progressed through the birth canal posterior first and folded in half. When the baby became stuck, Misty's birth team began reading books to figure out what to do. The books indicated that an episiotomy was necessary to complete the delivery. Caleb then cut Misty's vagina with a pair of unsterilized household scissors. The baby, a girl named Sydney Horner ("Sydney"[7]), was delivered stillborn on December 8, 2006. Sydney's cause of death was determined to be intrapartum asphyxia associated with a breech delivery.

The birth team did not call 911 immediately following Sydney's stillbirth. Instead they called John, a self-professed faith healer. John had not been present during Misty's labor or child birth. John came to the house and prayed over Sydney for hours in an attempt to raise her from the dead. Meanwhile, Misty's vaginal cuts were not sutured, dressed, or treated in any way.

The Lee's Summit Fire Department responded to the home after receiving a call regarding a stillbirth approximately nine hours earlier during a home delivery attempt. The purpose of the visit was to provide medical care to Misty. Caleb answered the door and spoke to Captain Timothy Schurder ("Schurder"). Caleb informed Schurder that the

[7]Because Sydney Horner shares a last name with her father, Caleb Horner, and her uncle, John Horner, we refer to Sydney by her first name for purposes of clarity. No familiarity or disrespect is intended.

couple's religious beliefs prevented another man from examining his wife's vagina. Caleb also said that he would call for medical help for Misty if she needed it. Caleb did not inform Schurder that he had performed an episiotomy on Misty and that those cuts remained untreated.

Following Sydney's stillbirth, Misty remained at her home with Caleb and members of his family, including John, Leathers, and Nield. The Mansfields visited Misty in the two weeks immediately following Sydney's stillbirth. They were never allowed to be alone with Misty. During that time, the Mansfields observed that Misty's condition was deteriorating. Approximately two weeks after Sydney's stillbirth, Caleb kicked the Mansfields out of the home. Gail was able to speak with Misty on the telephone thereafter. Caleb did allow the Mansfields to return to the home shortly before Misty's death.

On January 5, 2007, Misty called Dr. James Green ("Dr. Green"), a chiropractor she had previously visited, regarding her medical problems. The note Dr. Green wrote at the time of the telephone conversation with Misty stated:

> Misty answered the phone and in an extremely labored breathing and voice said she had had a baby breech and stillborn and had been having problems since, and now has severe pain in her tailbone and pelvis and has been unable to walk for at least five days. I asked her when she had the baby, and she asked someone that was with her because she couldn't remember. Misty said the 27th. With her labored voice and tone, I wasn't sure if she meant the baby was delivered the 27th or she hadn't been able to walk since the 27th. I asked if she had been back to her doctor since the delivery, and she said she had not and had not sought any care and does not have a regular medical doctor. I told her that her symptoms sounded like they were outside the scope of my practice and she should go to the emergency room. She stated *they* really did not want to do that. I told her again that I did not think it was a problem I could help her with and she should go to

6

the ER or, if she was unable to walk, then [call] 911. She said thanks for calling her back and ***they*** would decide what to do and then hung up.

(Emphasis added.)

Misty passed away on January 9, 2007. The Jackson County medical examiner performed an autopsy and determined that the cause of Misty's death was a severe infection that spread throughout her body and organs. The medical examiner noted that Misty's episiotomy was never treated, and as a result, Misty developed sepsis. In a hospital, the wound would have been sutured and treated with antibiotics. Thus, according to the Jackson County medical examiner, Misty would have survived had she received appropriate medical treatment.

The Mansfields filed a wrongful death suit against Caleb, John, Nield, and Leathers.[8] The petition alleged that the defendants were negligent in Misty's home birth and in the care of Misty following Sydney's stillbirth. In particular, the petition claimed that Caleb, Nield, and Leathers were members of a "cult-like group" led by John. One of the tenets of the group was to reject modern medicine in favor of faith healing. The Mansfields alleged that "[u]pon discovering Misty Mansfield's pregnancy Defendant C. Horner and Defendant J. Horner forbade Misty from receiving prenatal care and instructed her that the birth would be at home, and that Defendants C. Horner, J. Horner, Nield, and Leathers were fully prepared to safely deliver the child." The Mansfields alleged that Caleb "assumed control over [the] home birth" and that John "advis[ed]

---

[8]The Mansfields also named Carol Balizet, Home in Zion Ministries, The Key Publications, The Key Ministries, John G. Lake Ministries, No Greater Joy Ministries, John Doe Individual, and John Doe Religious Organization as defendants in the wrongful death suit. The claims against those defendants were dismissed without prejudice prior to trial.

7

members of The Cult on home birth."  The Mansfields claimed that, during the home birth and after Sydney's stillbirth, Caleb, John, Nield, and Leathers provided Misty with "horribly inadequate care" that ultimately resulted in Misty's death.

Nield entered into a settlement agreement with the Mansfields prior to trial, and the Mansfields dismissed their claim against her.  A jury trial was held on the Mansfields' remaining claims against Caleb, John, and Leathers in December 2012.  The Mansfields were represented by counsel, but the Horners and Leathers represented themselves *pro se* throughout the trial.

The Mansfields theorized that the Horners and Leathers "brainwashed" Misty into refusing medical care, that they told Misty she was going to "be okay" when they knew otherwise, that they refused medical treatment for Misty, and that they refused Misty access to anyone who believed differently than them.

The Mansfields called Karen Tadych ("Tadych"), John's ex-wife,[9] as a witness. Tadych testified as to the indoctrination of Misty into the religious group led by John.  In particular, Tadych testified about her participation with John in pre-marital counseling for Caleb and Misty.  During the pre-marital counseling, John and Tadych taught Misty about the role of a woman in a marriage.  John and Tadych instructed Misty that, according to their beliefs, a wife should be wholly submissive to the husband so that if they disagree, the man makes the ultimate decision.  According to Tadych, members of the religious group led by John believed that wives have no right to tell their husbands

---

[9]Like Caleb and Misty, John and Tadych participated in a marriage ceremony but never obtained a marriage license from the State of Missouri.

what they will or will not do. Instead, the wife and children must submit to the authority of the husband in order to honor and respect him. Further, John and Tadych instructed Misty regarding the rejection of modern medicine in favor of faith healing. Essentially, John and Tadych taught Misty to rely solely on God for healing.

In addition, Tadych testified that isolation was part of the indoctrination process into the religious group led by John. All new members of the religious group experienced isolation from persons who did not believe as the group did. If a relationship did not include a "healthy spiritual tie," then that relationship was broken. Eventually, members of the religious group led by John would have no relationships outside of those with other members of the group.

Tadych also testified as to John's religious beliefs. Tadych testified that John believes he can talk to God and that God sends him visions in which God tells John that medicine is evil. Further, according to Tadych's testimony, John believes that he has a healing power that includes the ability to raise people from the dead. Tadych finally testified that John has a "messianic complex" so that he believes he, like Jesus, "walks in no known sin."

Finally, Tadych testified as to John's prior involvement in other deaths in which medical treatment was avoided based on religious beliefs. During Tadych's marriage to John, he was involved in four home births that resulted in the death of the infants, and the death of one child and one adult who both suffered from a treatable illness or disease. Every death was the result of medical treatment being rejected in favor of faith healing, including John's purported healing power.

9

In addition to Tadych's testimony, the Mansfields presented Gail's testimony to corroborate their theory that Misty was brainwashed by Caleb, John, and Leathers. Gail testified that prior to Misty's marriage to Caleb, Misty was "very pigheaded, very headstrong, and very opinionated." After her marriage, though, Misty slowly changed into being wholly submissive to Caleb. As an example, Gail testified that when Misty married Caleb, she abandoned her dream of being a police officer in favor of being a stay-at-home mother in accordance with Caleb's wishes. Further, Gail testified about how Caleb isolated Misty from her family and friends after their marriage: "Caleb didn't really want Misty to be around people that [sic] didn't think like he thought. . . . He tried to isolate her from both of the brothers, from Darrell and I [sic], from some of her friends, and he definitely wanted to get rid of me. He didn't want me in the picture at all because I didn't believe like that."

Gail also testified as to Caleb's behavior during Misty's pregnancy and following the stillbirth of Sydney. When Misty attempted to have a sonogram, she called Caleb to tell him she was at a doctor's office. Caleb forbade Misty from obtaining the sonogram, so Misty left the doctor's office immediately. Further, Caleb forbade Gail from attending the home birth because "[h]e did not want anyone there that [sic] would call the police if anything went wrong." Finally, Gail testified that Misty was isolated after Sydney's stillbirth so that someone from the Horner family was always in the room whenever Gail and Darrell visited Misty.

The Mansfields also presented evidence of their damages at trial. Dr. John Ward ("Dr. Ward"), a forensic economist, testified as to the economic damages that resulted

10

from Misty's death. According to Dr. Ward, economic damages are "those [damages] that can be measured in the marketplace in some fashion." Economic damages include the decedent's earning capacity and services that the decedent performed. Dr. Ward calculated that the present value of the economic damages resulting from Misty's death totaled $645,020. Dr. Ward did not offer an opinion as to non-economic damages, which would include "pain and suffering, bereavement, [and] loss of enjoyment of life" because those damages cannot be measured by the marketplace.

Instead, Gail and Darrell testified as to the non-economic damages. Gail testified that Misty was her "best friend," and both Gail and Darrell testified as to their loss of companionship with Misty. Further, the medical examiner testified as to the pain Misty suffered as a result of the tears and cuts to her genitalia, and the resulting infection and sepsis.

At the close of the Mansfields' evidence, Caleb made an oral "motion to dismiss based on plaintiffs' failure to provide sufficient evidence to prove their claims of negligence." The trial court considered and overruled the motion. The Horners and Leathers then presented evidence to the jury. Caleb, John, and Leathers all testified, but pursuant to a pre-trial ruling, they were not allowed to introduce any other evidence because of their failure to participate in discovery.

After two weeks of evidence and less than three hours of deliberation, the jury delivered a unanimous verdict. The verdict found Caleb 45% at fault, John 35% at fault, Leathers 20% at fault, and Misty 0% at fault. The jury further found the total amount of compensatory damages to be $8,650,000. In addition, the jury found Caleb, John, and

11

Leathers each responsible for damages for aggravating circumstances in the amounts of $40 million, $40 million, and $20 million respectively. The trial court entered its Judgment in accordance with the jury's verdict.

Following a limited entry of appearance by counsel on behalf of Caleb and John, the Horners filed two motions in the trial court: (1) a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, motion for a new trial; and (2) a motion to open, amend, and correct the judgment. The motion for JNOV or, in the alternative, motion for new trial listed several bases for relief, most of which are raised on appeal. The Horners' motion to open, amend, and correct the judgment asserted that the Horners were entitled to remittitur because section 510.265[10] limits damages for aggravating circumstances to five times the net amount of the judgment. The trial court overruled both motions.

The Horners appeal,[11] setting forth nine claims of error.

**Point One: Whether the Mansfields Made a Submissible Case of Negligence**

The Horners' first point on appeal argues that the trial court erred in overruling their motion for JNOV because the Mansfields failed to make a submissible case of negligence. In particular, the Horners claim that the Mansfields failed to establish the duty and causation elements because "Misty was an emancipated adult of sound mind, with the duty to make her own decisions concerning medical treatment, she voluntarily encountered the known risks associated with refusing medical treatment, and her

---

[10]All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.
[11]Leathers is not a party to this appeal.

12

decisions constitute[d] the actual and proximate cause of her death." [Appellants' Brief p. 24.] The Mansfields claim that this point is unpreserved for appeal because the Horners did not make a sufficiently specific motion for directed verdict following the close of the Mansfields' evidence.

Before considering the merits of the Horners' first point on appeal, we must first consider whether the issue is preserved for our review. *Pope v. Pope*, 179 S.W.3d 442, 450 (Mo. App. W.D. 2005).

> "To preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion for a new trial or to set aside a verdict must assign as error the trial court's failure to have directed such a verdict. Failure to move for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to prove a submissible case."

*Id.* at 451 (quoting *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 163 (Mo. App. W.D. 1997)). Rule 72.01(a) provides: "A motion for a directed verdict shall state the *specific* grounds therefor." (Emphasis added.) If the motion for a directed verdict is insufficient, then a subsequent motion for JNOV is without basis and preserves nothing for review. *Pope*, 179 S.W.3d at 451.

Here, Caleb made an oral motion at the close of the Mansfields' evidence. He stated: "I would like to make a motion to dismiss based on plaintiffs' failure to provide sufficient evidence to prove their claims of negligence."[12] In *Pope*, we found that a motion for directed verdict was insufficiently specific to preserve arguments for appeal. *Id.* at 452. There, the motion argued, in part, that the plaintiff "failed to produce legally

---

[12]Although Caleb did not denominate his motion correctly, we will treat it as a motion for a directed verdict for the purpose of this appeal.

13

sufficient evidence that this Defendant violated any duty to Plaintiff" and that the plaintiff "failed to produce any evidence which would establish that any act of this Defendant caused or contributed to cause any damage allegedly sustained by Plaintiff." *Id.* Caleb's oral "motion to dismiss" was less specific than that defendants' motion in *Pope*. Thus, Caleb's oral "motion to dismiss" preserved nothing for appeal.

After the trial court denied Caleb's oral motion, the Horners elected to present evidence. "By presenting evidence, appellants waived any error in denying the motion for directed verdict at the close of respondent's case in chief." *Powell v. Hickman*, 793 S.W.2d 885, 891 (Mo. App. W.D. 1990). When the defendants choose to present evidence, "[a] motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue." *Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. banc 2012). Without it, any question regarding submissibility is not preserved for appeal. Neither Caleb nor John moved for a directed verdict at the close of all the evidence. Thus, the Horners' point on appeal regarding the submissibility of the Mansfields' claims for wrongful death based on negligence is unpreserved for appeal.

In their reply brief, the Horners request plain error review in the event that we conclude its first point relied on is unpreserved for appeal. Rule 84.13(c) provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rarely will we find plain error in a civil case. *City of Greenwood v. Martin Marietta Materials, Inc.*, 299 S.W.3d 606, 617 (Mo.

App. W.D. 2009). We decline to find that manifest injustice or a miscarriage of justice resulted from the trial court's denial of the Horners' motion for JNOV.

Though the Horners' first point on appeal is loosely couched in terms of the submissibility of the Mansfields' claim for wrongful death based on negligence, in fact, the genesis of their point on appeal is a complaint that the trial court should have entered judgment in their favor because Misty was a competent adult who had the "absolute right" to make her own healthcare decisions, including the decision to have a home birth and to refuse medical treatment following the home birth. The Horners argue that by choosing to have a home birth and refuse medical treatment, Misty assumed the risks associated with her decision and that Misty's decision was the actual and proximate cause of her death. Assumption of the risk is an affirmative defense. *See, e.g., Martin v. Buzan*, 857 S.W.2d 366, 368 (Mo. App. E.D. 1993). The burden of proof rested with the Horners as the proponents of the defense. *Stewart v. K-Mart Corp.*, 747 S.W.2d 205, 208 (Mo. App. E.D. 1988). At trial, the Horners persistently sought to hold Misty accountable for her own choices, and in keeping with this theory of defense, persuaded the trial court to submit a comparative fault instruction. That instruction directed the jury to assign a percentage of fault to Misty if it believed that she "voluntarily participated in the home birth of her daughter and refused to allow medical personnel to be present," causing or contributing to cause her death. The jury considered the evidence, and assigned 0% fault to Misty, thus rejecting the Horners' defense. "[A] directed verdict is not given in favor of the party having the burden of proof no matter how overwhelming that party's evidence may be or how miniscule the other party's evidence may be . . . ."

15

*Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993). The standard for reviewing a denied motion for JNOV and for reviewing a denial of a motion for directed verdict are essentially the same. *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 204 (Mo. App. W.D. 2013).

The Horners generally assert that Missouri recognizes "the right of individual autonomy over decisions relating to one's health and welfare." *Cruzan v. Harmon*, 760 S.W.2d 408, 416 (Mo. banc 1988), *aff'd*, 497 U.S. 261 (1990). We accept this premise, but reject the Horners' claim that *Cruzan* required the entry of judgment in their favor. The Mansfields' theory was that the Horners "brainwashed" Misty so that the "choice" to have an unassisted home birth and to refuse medical treatment was not, practically speaking, her own. In rejecting the opportunity to assign a percentage of fault to Misty, the jury apparently agreed.

We decline to hold that the trial court committed plain error in overruling the Horners' motion for JNOV. The Horners' first point on appeal is denied.

**Point Two: Whether the Jury's Verdict Was Supported by Substantial Evidence**

The Horners' second point on appeal argues that the trial court erred in denying their motion for a new trial because the $108,650,000 verdict was not supported by substantial evidence and because the jury placed no fault on Misty, despite the fact that no evidence was presented that she was incompetent to make her own healthcare decisions. The Horners claim that the verdict indicates that the jury "was motivated by bias, passion and prejudice" so that a new trial was appropriate. [Appellants' Brief p. 31.]

We review the trial court's denial of a motion for a new trial for abuse of discretion. *Westerman v. Shogren*, 392 S.W.3d 465, 469 (Mo. App. W.D. 2012). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration. *Id.* at 469-70. In considering whether the trial court abused its discretion, we view the facts in the light most favorable to the trial court's order. *St. Louis County v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013).

A simple claim that the jury's verdict was excessive does not entitle a movant to a new trial. *Johnson v. Allstate Ins. Co.*, 262 S.W.3d 655, 668 (Mo. App. W.D. 2008). "To obtain a new trial on the basis of an excessive verdict, the defendant must demonstrate that the verdict was the product of bias and prejudice." *Id.* The defendant meets that burden if he establishes that "the verdict was 'glaringly unwarranted by the evidence and that some trial error or misconduct by the prevailing party was responsible for prejudicing the jury against the defendant.'" *Id.* (quoting *Armon v. Griggs*, 60 S.W.3d 37, 40 (Mo. App. W.D. 2001)). "A jury verdict is excessive when the amount of the verdict exceeds fair and reasonable compensation for plaintiff's damages." *Harrell v. Cochran*, 233 S.W.3d 254, 258 (Mo. App. W.D. 2007).

Neither the Horners' motion for a new trial nor their brief demonstrate that the verdict was a product of bias and prejudice. Nowhere in the motion for new trial do the Horners allege that there was "some trial error or misconduct by [the Mansfields]" so that the verdict was a product of bias or prejudice. The Horners' second point on appeal

17

argues that the jury's verdict was the product of bias and prejudice in that the trial court made "improper evidentiary rulings" and allowed "argument that incited the bias, passion and prejudice of the jury." [Appellants' Brief p. 33.] The Horners never identify, though, *which* improper evidentiary rulings and arguments they claim to have resulted in bias and prejudice.[13] Simply claiming that the amount awarded by the jury was excessive is not enough to warrant a new trial. Thus, we cannot conclude that the trial court abused its discretion in denying the Horners' motion for a new trial.

Even if the Horners' motion for new trial would have alleged that "some trial error or misconduct by the prevailing party was responsible for prejudicing the jury against" them, we would not find that the trial court abused its discretion in concluding that the jury's assessment of damages was not so "glaringly unwarranted by the evidence" as to warrant a new trial. With respect to damages awarded for wrongful death claims, section 537.090 provides:

> [T]he trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death . . . . In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts . . . .

---

[13]In the argument following their third point on appeal, the Horners state that "the jury's excessive verdict was, in part, the product of the irrelevant testimony of Appellant John Horner's ex-wife, Karen Tadych." [Appellants' Brief p. 37.] Even if the Horners would have asserted in the second point on appeal that the jury's verdict was the result of the trial court's improper entry of Tadych's testimony, we would reject the argument because, as discussed *infra*, we do not conclude that the trial court erred in admitting Tadych's testimony.

Here, the Mansfields asked the jury to assess compensatory damages, including both economic and non-economic damages, as well as damages for aggravating circumstances against the Horners. Their request was supported by the evidence presented a trial.

The Mansfields provided the testimony of Dr. Ward, an economist who gave his expert opinion as to the economic losses suffered as a result of Misty's death. Dr. Ward valued the economic losses at $645,020. Both Gail and Darrell testified as to the non-economic damages suffered from Misty's death. In particular, they testified as to the impact the loss of their daughter had on their lives, including the loss of companionship. Further, the medical examiner gave expert testimony about the pain that Misty suffered from her vaginal cuts and tears. Each of these pieces of testimony established damages that section 537.090 deems recoverable in wrongful death suits.

The jury, after hearing the evidence presented to it and receiving an instruction regarding the damages it was allowed to award, entered a verdict in the amount of $108,650,000, with $8,650,000 serving as compensatory damages and $100,000,000 serving as aggravating circumstance damages. The Horners argue that, because the jury's award of compensatory damages far exceeds the amount Dr. Ward calculated, the award was excessive. What the Horners fail to appreciate is that compensatory damages include both economic damages, to which Dr. Ward testified, and non-economic damages, to which Gail, Darrell, and the medical examiner testified. Thus, we do not conclude that the trial court abused its discretion in finding that the amount of compensatory damages

found in the jury's verdict was not "glaringly unwarranted by the evidence" presented at trial.

The Horners further argue that the total damage award is excessive because it exceeds the amount requested by the Mansfields' counsel during closing argument. The Mansfields asked the jury to award $88,385,260 in total damages. The Horners fail to cite any case law that provides a verdict is excessive if it is more than the award requested by plaintiff's counsel. "Failure to cite relevant authority supporting a point or to explain the failure to do so preserves nothing for review." *Goudeaux v. Bd. of Police Comm'rs of Kansas City*, 409 S.W.3d 508, 516 (Mo. App. W.D. 2013) (internal quotation marks omitted). The Horners failed to preserve this argument. Even if they had preserved the argument, though, our case law has consistently held that a jury is free to award damages above what is requested. *See, e.g.*, *Id.* at 521 (recognizing "the legion of cases where a plaintiff suggests a damage award in a personal injury case during closing only to receive a higher award from the jury").

The Horners' final argument in its second point on appeal is that the trial court abused its discretion in denying the motion for new trial because the jury's verdict failed to properly apportion damages to reflect Misty's fault in her death. The Horners again argue Misty chose to refuse medical treatment so that the jury was incorrect to conclude that she bore no fault in her death. The verdict form given by the trial court to the jury required the jury to calculate Misty's fault in her death. The jury did so, finding that Misty shouldered zero percent of the blame. The jury was presented with evidence from which it could have concluded that Misty was brainwashed so that her choices to have a

home birth and refuse professional medical care were not the product of her free will. While the Horners presented competing evidence that Misty retained the ability to choose, the jury rejected that evidence. We cannot conclude that the trial court abused its discretion in concluding that the jury's apportionment of fault was supported by sufficient probative evidence.

The Horners' second point on appeal is denied.

### *Point Three: Whether the Verdict Violated the Horners' Constitutional Right to Due Process*

The Horners' third point on appeal argues that the trial court erred in overruling their motion for a new trial because the verdict awarding $108,650,000 in damages violated their constitutional right to due process under the Fourteenth Amendment of the United States Constitution and under Article I, section 10 of the Missouri Constitution. The Horners assert that, when scrutinized under the framework of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), the jury's verdict constitutes a grossly excessive award so that it is an arbitrary deprivation of the Horners' property.

"'The assessment of damages is primarily a function for the jury.'" *Krysa v. Payne*, 176 S.W.3d 150, 155 (Mo. App. W.D. 2013) (quoting *McCormack v. Capital Elec. Constr. Co.*, 159 S.W.3d 387, 395 (Mo. App. W.D. 2004)). Ordinarily, we must defer to the jury's determination of damages because it is in a better position to assess the credibility of the witnesses and to determine the appropriate compensation. *Id.* Thus, as we stated in our review of the Horners' second point on appeal *supra*, we generally

21

review the trial court's conclusion regarding the reasonableness of the jury's verdict for abuse of discretion. *Westerman*, 392 S.W.3d at 469.

The Horners challenge the jury's entry of damages for aggravating circumstances as constitutionally excessive. Aggravating circumstance damages in wrongful death cases are subject to the same due process safeguards as punitive damages awarded in other cases. *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 810 (Mo. App. W.D. 2008) (citing *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996)). Thus, decisions addressing due process considerations in cases involving an award of punitive damages are equally applicable to cases awarding damages for aggravating circumstances in a wrongful death case.

"The decision to punish a tortfeasor through an award of punitive damages 'is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment'" of the United States Constitution and with Article I, section 10 of the Missouri Constitution. *Krysa*, 176 S.W.3d at 155 (quoting *Letz*, 975 S.W.2d at 177). "We 'review the trial court's determination of the constitutionality of the punitive award *de novo,* deferring to the trial court's findings of fact, unless they are clearly erroneous.'" *Heckadon v. CFS Enters., Inc.*, 400 S.W.3d 372, 382 (Mo. App. W.D. 2013) (quoting *Krysa*, 176 S.W.3d at 156).

Compensatory damages and punitive damages serve separate purposes. *Campbell*, 538 U.S. at 416. While compensatory damages "'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct,'" punitive damages "are aimed at deterrence and retribution." *Id.* (quoting *Cooper Indus., Inc. v.*

22

*Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001)). The Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* "'[W]hen an award can fairly be categorized as 'grossly excessive' in relation to the interests of punishment and deterrence, it penetrates the 'zone of arbitrariness' that violates the Due Process Clause . . . .'" *Krysa*, 176 S.W.3d at 155-56 (quoting *Letz*, 975 S.W.2d at 177).

There is "[n]o precise constitutional line or simple mathematical formula" to determine whether a punitive damage award is grossly excessive. *Heckadon*, 400 S.W.3d at 382. "Rather, the imposition of punitive damages requires a proper balance be struck between the need for punishment to deter future misconduct and the severity of the award." *Id.* The United States Supreme Court has instructed courts reviewing the constitutionality of punitive damage awards to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). The Missouri legislature has effectively codified the obligation to consider due process implications at section 510.263.6 which directs that the doctrine of remittitur "based on the trial judge's assessment of the totality of the surrounding circumstances, shall apply to punitive damage awards." Consistent with the holding in *Call*, 925 S.W.2d at 849, the legislature has expressed its intent that due process concerns should apply equally to aggravating circumstances awards, as

23

section 510.263.7 defines "punitive damages" for purposes of section 510.263 as "an award for punitive or exemplary damages or an award for aggravating circumstances."

"'The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" *Campbell*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). There are several factors to consider when determining the degree of reprehensibility: (1) whether "the harm caused was physical as opposed to economic"; (2) "whether the tortious conduct evinced an indifference or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.*

Using the factors set forth in *Campbell*, we conclude that the degree of the Horners' reprehensibility was high. First, the harm caused by the Horners was physical. Misty lost her life as a result of the botched episiotomy and as a result of the Horners' refusal to allow her to seek professional medical care following Sydney's stillbirth. The Mansfields' damages, both economic and non-economic, sprung from that physical harm.

Second, the Horners' negligence demonstrated "an indifference or reckless disregard" to Misty's health and safety. Prior to Caleb and Misty's marriage, the couple attended pre-marital counseling, during which John and Caleb began the process of brainwashing Misty so that she would wholly submit to Caleb and refuse professional medical care. The brainwashing, while perhaps not complete at the time of the wedding ceremony, continued throughout Caleb and Misty's marriage. The Horners encouraged

24

Misty to discontinue relationships that did not include "healthy spiritual tie[s]," which resulted in Misty's isolation from friends and family. Then, knowing that Misty would submit to Caleb, the Horners convinced Misty that an unassisted home birth was appropriate for the delivery of her first child. Despite Walla's advice that Misty go to the hospital because the child was in distress, Caleb refused to allow Misty to go. Then, after laboring for days, Caleb performed an episiotomy on Misty with unsterilized household scissors, and Misty never received medical treatment for her vaginal cuts. In the aftermath of Sydney's home birth, the Horners refused to allow Misty to seek professional medical care. Those facts, when considered in concert, support the conclusion that the Horners demonstrated an "indifference or reckless disregard" to Misty's health and safety.

The third factor, whether "the target of the conduct had financial vulnerability," is inapplicable in the instant suit. The fourth factor, whether "the conduct involved repeated actions or was an isolated incident," is applicable. Tadych testified as to four other home births in which John had been involved that resulted in the death of the child, and the death of one child and one adult who both suffered from a treatable illness or disease. Every death was the result of medical treatment being rejected in favor of faith healing, including John's purported healing power. "'[A] recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance,'" but "in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions." *Campbell*, 538 U.S. at 423 (quoting *Gore*, 517 U.S. at 577). Here, the conduct in question -- brainwashing

25

individuals so that they refuse professional medical care in favor of relying on John's purported healing power -- demonstrate that John's conduct was not an isolated incident.

Finally, the evidence demonstrated that Misty's death "was the result of intentional malice, trickery, or deceit," and not "mere accident." According to Gail's testimony, Misty believed, based on representations made by the Horners, that Leathers and Nield were midwives and, therefore, qualified to deliver her child. Further, the Horners claimed that John had a healing power, despite John's involvement in four botched home births that resulted in the death of the child and two deaths of persons who suffered from treatable illnesses or diseases. Then, following the episiotomy with unsterilized household scissors and Sydney's stillbirth, the Horners forbade Misty from seeking professional medical treatment and lied to outsiders, including a first responder, about Misty's condition.

The second guidepost requires us to consider the disparity between the compensatory damages awarded and the punitive damages awarded. "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426. The *Campbell* Court declined "to impose a bright-line ratio which a punitive damages award cannot exceed" but noted "that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Id.* at 425.

Here, the compensatory damages were substantial: $8,650,000. In addition to the $645,020 of economic damages to which Dr. Ward testified, the jury awarded just over

26

$8 million of non-economic damages. The $8 million included damages for the pain and suffering Misty endured between the time of the episiotomy and her death as well as the loss of companionship that the Mansfields suffered as a result of their daughter's death. Contrary to the Horners' suggestion, we do not find that the compensatory damage calculation included a punitive element because, as discussed *supra*, evidence regarding the damages suffered by Misty and the Mansfields supported the award. The aggravating circumstance damages were also substantial: $100 million.

The ratio of the aggravating circumstance damages to the compensatory damages is approximately 11 to 1. The Horners claim that this ratio is "[itself] indicative of an excessive verdict." [Appellants' Brief p. 37.] While *Campbell* indicated that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution," we disagree with the Horners that the 11 to 1 ratio, standing alone, is indicative of an excessive verdict. 538 U.S. at 425. When considering the evidence, the ratio is appropriate.

The jury trial was conducted over a two-week period, during which the jury heard evidence about Misty's injury and death as well as the Horners' actions surrounding her injury and death. As discussed *supra*, the Horners' actions are highly reprehensible. Further, there was evidence that Misty was not the only victim of John's brainwashing. Given the reprehensibility of the Horners' actions as well as the goal to deter the Horners from similar conduct in the future justifies the 11 to 1 ratio so that, even considering the substantial compensatory damages awarded, substantial punitive damages were also appropriate. To conclude otherwise would ignore the unique circumstances of this case.

27

The final guidepost set forth in *Campbell* requires us to consider "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). The Horners do not cite, and we are not aware of, any civil penalties that were authorized to be imposed against the Horners. Thus, this guidepost offers no guidance to our analysis.

Having considered the three guideposts set forth in *Campbell* for reviewing whether an award for aggravating circumstances passes constitutional muster, we do not conclude that the jury's verdict was grossly excessive, especially in light of the reprehensibility of the Horners' actions.

The Horners' third point on appeal is denied.

**Point Four: Whether Maintaining the Instant Suit Violated the First Amendment**

The Horners' fourth point on appeal argues that the trial court erred in denying its motion for JNOV because the Mansfields' suit required the jury to address the merits of religious beliefs. In particular, the Horners claim that the jury was required to determine the "sincerity of Misty's religious beliefs" as well as the merits of the Horners' religious beliefs. [Appellants' Brief p. 40.] The Mansfields assert that this point on appeal is unpreserved for appeal because the Horners did not make a sufficiently specific motion for directed verdict following the close of the Mansfields' evidence.

"Constitutional issues are waived unless raised at the earliest possible opportunity consistent with orderly procedure." *Hollis v. Blevins*, 926 S.W.2d 683, 683 (Mo. banc 1996). Here, Caleb's answer to the Mansfields' petition stated the following as an "affirmative defense":

28

Defendant further answers that Plaintiffs' Petition for Damages is an attempt to interfere with the decedent's and parties' freedom of religion and assembly, which is a direct violation of both the Missouri Constitution and the United States Constitution, and should therefore be dismissed.

John's answer to the Mansfields' petition contained a similar "affirmative defense":

In further response, Plaintiffs' daughter, the decedent [sic], Misty Mansfield/Horner, was always in her right mind. Misty Mansfield/Horner, being an emancipated adult, having made clear to everyone that [sic] came in contact with her, that from her personal discovery of the risks associated with both hospital births and home births, understood these risks and chose to exercise her religious freedom to trust God at home. Many, including Defendant, that [sic] came into contact with Misty heard her say, "I would rather die by the hand of God, than live by the hand of men." This was even stated to the police officers of Lee's Summit. Defendant asserts that both he and Misty had/have the right to express all religious views according to the freedom of religious expression and assembly afforded by the Constitutions of Missouri and the United States.

According to *Hollis*, the Horners' claimed constitutional error was not waived because they raised it at the earliest opportunity: in their answers to the Mansfields' petition.[14]

Whether a constitutional issue has been waived is distinct from whether a constitutional issue has been preserved. To properly preserve a constitutional question, a party must:

(1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated, such as by explicit reference to the article and section or by quotation of the provision itself; (3) state the facts showing the violation; and (4) ***preserve the constitutional question throughout for appellate review***.

---

[14]Perhaps a more efficient strategy would have been to file a motion to dismiss the Mansfields' petition for failure to state a claim in lieu of an answer, much like the defendants did in *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997). There, in response to a motion to dismiss from the defendant, the trial court issued a judgment dismissing all counts for "'failure to state a claim upon which relief can be granted and because such claims as alleged against said defendant infringe upon its rights provided by the First Amendment to the United States Constitution.'" *Id.*

*Callier v. Dir. of Revenue*, 780 S.W.2d 639, 641 (Mo. banc 1989) (emphasis added) (internal quotation marks omitted). The Horners failed to meet the final requirement.

As we concluded in our discussion of the Horners' first point on appeal, *supra*, Caleb's oral "motion to dismiss" following the Mansfields' evidence was insufficiently specific so that the Horners' subsequent motion for JNOV was without basis and preserved nothing for review. Further, the Horners elected to present their own evidence and failed to move for a directed verdict at the close of all the evidence so that any subject appropriate for a JNOV, including whether the instant suit required the jury to adjudicate the merits of religious beliefs, was not preserved for our review.

The Horners, in their reply brief, ask us to review their fourth point on appeal for plain error pursuant to Rule 84.13(c) in the event that we conclude its fourth point on appeal is unpreserved. "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). Plain error is rarely present in civil cases. *City of Greenwood*, 299 S.W.3d at 617. Finding that this suit did not require the jury to determine the sincerity of Misty's religious beliefs or the merits of the Horners' religious beliefs, we decline to find manifest injustice or a miscarriage of justice.

"The First Amendment applies to any application of state power, including judicial decision on a state's common law." *Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. banc 1997) (citing *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191 (1960)). The First Amendment, insofar as it applies to the Free Exercise Clause, "encompasses the freedom

30

to believe and the freedom to act." *Hester v. Barnett*, 723 S.W.2d 544, 558 (Mo. App. W.D. 1987) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). Only the freedom to believe is absolute. *Id.* "Conduct remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 304. Courts have not hesitated to impose tort liability "where the religious conduct otherwise protected 'posed some substantial threat to public safety, peace or order.'" *Hester*, 723 S.W.2d at 558 (quoting *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).

The Mansfields' suit sought to establish liability for the Horners' actions, not their beliefs. A court may impose liability for conduct "[i]f neutral principles of law can be applied without determining questions of religious doctrine, polity, and practice." *Gibson*, 952 S.W.2d at 246. "Thus, where the truth or falsity of a religious belief becomes the object of judicial redress, the inquiry 'enters a forbidden domain.'" *Hester*, 723 S.W.2d at 558 (quoting *United States v. Ballard*, 322 U.S. 78, 87 (1944)). The Horners argue that the Mansfields' suit required the jury to examine the sincerity of Misty's religious beliefs as well as the merits of the Horners' religious belief in faith healing. We disagree.

We acknowledge that "[g]overnmental scrutiny of the sincerity of one's religious belief[s] is offensive to our tradition of individual rights." *Penner v. King*, 695 S.W.2d 887, 889 (Mo. banc 1985). Nonetheless, the jury was not asked to determine ***whether*** Misty believed in submitting to Caleb and faith healing. Both the Mansfields and the Horners agreed as to that point during trial. The Mansfields asserted to the jury that Misty was brainwashed by the Horners so that she believed, without reservation, in the

31

virtues of submitting to Caleb and faith healing. While the Horners disagreed as to whether Misty was brainwashed, they, too, asserted to the jury that Misty believed in submission and faith healing. To claim on appeal that this case required the jury to determine the sincerity of Misty's beliefs ignores the record below.

We also find that this case did not require the jury to determine the validity of the Horners' religious belief in faith healing. Instead, this case required the jury to determine whether Caleb and John were negligent for their actions during the home birth or subsequent to the home birth. The jury instruction gave the jury several theories for finding Caleb negligent:

(a) defendant Caleb Horner failed to arrange health care for Misty; or

(b) defendant Caleb Horner failed to account and prepare for Sydney being in a breach [sic] position; or

(c) defendant Caleb Horner failed to adequately represent the abilities of Wendi Nield and Amber Leathers to Misty Mansfield; or

(d) defendant Caleb Horner failed to act on information he was given from more knowledgeable sources than himself; or

(e) defendant Caleb Horner failed to properly prepare himself to conduct a home birth; or

(f) defendant Caleb Horner had Misty submit to a home birth without ensuring that those present were qualified to assist in and perform a home birth; or

(g) defendant Caleb Horner performed an episiotomy on Misty and/or cut her vagina; or

(h) defendant Caleb Horner prevented Misty from making a fully informed decision on whether or not she wanted medical attention; or

(i) defendant Caleb Horner prevented Misty from receiving medical attention . . . .

Similarly, the jury instructions gave the jury several theories for finding John negligent:

(a) defendant John Horner convinced Caleb Horner to have Misty submit to a home birth without ensuring those present were qualified to assist in and perform a home birth; or

(b) defendant John Horner prevented Misty from making a fully informed decision on whether or not she wanted medical attention; or

(c) defendant John Horner prevented Misty from receiving medical attention; or

(d) defendant John Horner misrepresented his ability to heal . . . .

None of these instructions required the jury to determine the validity of the Horners' belief in faith healing. The jury never had to determine "the truth or falsity" of faith healing. Instead, the instructions required the jury to determine whether or not the Horners' actions -- particularly with respect to Caleb's actions during the home birth and John and Caleb's actions preventing Misty from seeking medical treatment following the home birth -- constituted negligence. Thus, we do not conclude that the trial court committed plain error in overruling the Horners' motion for JNOV with respect to their claim of a First Amendment violation.

The Horners' fourth point on appeal is denied.

## Point Five: Whether Disqualifying Nield from Testifying Constituted an Abuse of Discretion

The Horners' fifth point on appeal argues that the trial court abused its discretion in disqualifying Nield as a witness. The Horners claim that Nield did not violate "the rule on witnesses" because the trial court invoked the rule with respect to witness testimony, not opening statements. [Appellants' Brief p. 42.] Further, the Horners contend that there was no proof presented to the trial court that Nield was present during opening

33

statements as a result of "the consent, connivance or procurement of" the Horners. [Appellants' Brief p. 42.] The Mansfields assert that this issue is unpreserved for appeal because the Horners never made an offer of proof at trial regarding the admissibility of Nield's testimony.

Our Supreme Court has set forth the four prerequisites for pursuing a claim of evidentiary error on appeal:

> First, the party must raise the claimed error in a timely fashion, which means (when the claim is that the trial court improperly excluded evidence) that the proponent must offer the evidence at trial and make a detailed offer of proof concerning that evidence when the trial court orders that it be excluded. Second, the party must preserve that claim by including it in its motion for a new trial. Third, the party must present this claim in a proper point relied on in the appellate brief. Finally, the party must provide a sufficient argument on that point in the party's brief.

*Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 453 n.4 (Mo. banc 2014) (citations omitted). The Horners have failed to meet the first prerequisite.

"Ordinarily, in order to preserve an argument that evidence was improperly excluded at trial for appeal, the proponent of that evidence is required to make an offer of proof." *KRP ex rel. Brown v. Penyweit*, 219 S.W.3d 829, 836 (Mo. App. W.D. 2007). In addition to being specific and definite, the offer of proof must demonstrate (1) what the evidence will be; (2) the purpose and object of the evidence; and (3) each fact essential to establishing the admissibility of the evidence. *Terry v. Mossie*, 59 S.W.3d 611, 612 (Mo. App. W.D. 2001). "The preferable way to make an offer of proof is by asking the proposed witness questions outside the jury's presence, but narrative offers of proof are occasionally found to be adequate." *Id.* (emphasis omitted).

34

Prior to trial, the trial court indicated that "[t]he rule excluding witnesses from the courtroom while other witnesses are testifying" would be invoked. Nield remained in the courtroom during the Mansfields' and Leather's opening statements. Immediately following the opening statements, John asked the trial court if Nield could be in the courtroom and still testify. The trial court said, "No, she cannot, okay. The rule has been invoked and it excludes all witnesses who will be testifying. It excludes them from throughout the entire trial." The Horners never attempted to introduce Nield as a witness and never made an offer of proof to the trial court regarding Nield's testimony. Thus, the trial court was unaware as to what Nield would testify, the purpose and object of Nield's testimony, and the facts essential to establishing the admissibility of Nield's testimony. This point is unpreserved for our review.

Perhaps recognizing that we would conclude that the point is unpreserved for review, the Horners ask in their reply brief for plain error review. Under Rule 84.13(c), "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error requires more than a finding of mere prejudice. *City of Greenwood*, 299 S.W.3d at 617. Instead, the error must have "'affected substantial rights and a manifest injustice or miscarriage of justice [must have] resulted therefrom.'" *Id.* (quoting *Ruzicka v. Ryder Student Transp. Servs., Inc.*, 145 S.W.3d 1, 15 (Mo. App. S.D. 2004)).

The decision to permit or exclude a witness who has violated the rule of exclusion to testify is within the trial court's discretion. *Frasher ex rel. Autenrieth v. Whitsell*, 832

35

S.W.2d 18, 19 (Mo. App. W.D. 1992). To establish an abuse of discretion, the appellant must make "a clear showing of abuse and prejudice as a result of the trial court's ruling." *Id.* The appellant must cite specific grounds for prejudice. *Id.*

Here, the Horners' brief fails to assert any specific ground for prejudice. The brief simply states, "Wendi was one of only a few people that [sic] had intimate knowledge of the events surrounding the birth and Misty's decision to refuse medical care." [Appellants' Brief p. 44.] The brief never delineates what Nield's testimony would have established at trial to which the other witnesses present for the home birth -- Moore, Caleb, and Leathers -- did not already testify. In their reply brief, the Horners assert that Nield's testimony was proper because she "observed first-hand Misty's birth and the events that followed." [Reply Brief p. 14.] Again, simply stating that Nield was present for the home birth is not enough; a demonstration of prejudice requires a specific explanation of how Nield's testimony, in particular, would have aided the Horners.

The Horners' fifth point on appeal is denied.

## Point Six: Whether Admitting Tadych's Testimony Constituted an Abuse of Discretion

The Horners' sixth point on appeal argues that the trial court erred in admitting Tadych's testimony. The Horners claim that Tadych's testimony was "was irrelevant and immaterial, did not tend to prove or disprove any issue in the case, and . . . only engendered the hatred, passion, and prejudice of the jury." [Appellants' Brief p. 45.] The Horners assert that Tadych was not present for the home birth so that the only purpose of her testimony was to "impugn the character and religious beliefs" of the Horners."

36

[Appellants' Brief p. 45.] The Horners further contend that the testimony Tadych offered about "cults" and "brainwashing" was inappropriate because it is a topic for experts, not lay persons.

There is no dispute that the Horners objected to the admission of Tadych's testimony based on its relevance. However, the objection at trial was narrower than the scope of their point on appeal. At trial, the Horners objected that Tadych's testimony was not relevant because she did not have first-hand knowledge of the relationship between Caleb and Misty, nor of the circumstances of Sydney's birth or Misty's death as Tadych was not present. This objection at best preserved the issue of the logical relevance of Tadych's testimony -- that is the extent to which it tended to prove or disprove an issue in dispute. The objection did not preserve a claim of error that Tadych's testimony was legally irrelevant because it was more prejudicial than probative in its effect, or that Tadych's testimony was improper expert testimony. "[A]n objection to evidence must be sufficiently clear and definite so that the trial court will understand the reason for the objection." *Blount v. Peipers*, 864 S.W.2d 392, 393 (Mo. App. E.D. 1993) (holding that objection on the grounds of irrelevancy without explanation for why the evidence was irrelevant preserved nothing for appellate review). Though all of the claimed bases of error in the admission of Tadych's testimony raised on appeal were not the subject of a timely objection at trial and are not preserved, the Horners request plain error review.

The trial court is vested with broad discretion regarding the admission or the exclusion of evidence so that the trial court's decision will not be disturbed absent abuse of discretion. *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 869 (Mo. App.

W.D. 2013). The trial court abuses its discretion when the ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Secrist v. Treadstone, LLC*, 356 S.W.3d 276, 280 (Mo. App. W.D. 2011). A reversal of the trial court's decision is appropriate only if the error was prejudicial so that the trial court's error affected the outcome of the trial. *Id.*

To be admissible, evidence must be both logically and legally relevant. *Westerman*, 392 S.W.3d at 474. Evidence is logically relevant if it "'make[s] the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting *Secrist*, 356 S.W.3d at 281). Legal relevance, on the other hand, concerns the balance between the probative value and the prejudicial effect of the evidence. *Id.* "That balancing requires the trial court to 'weigh the probative value, or usefulness, of the evidence against its costs, specifically the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence.'" *Id.* (quoting *Adkins v. Hontz*, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011)). If the cost of the evidence outweighs its usefulness, the evidence is not legally relevant and should be excluded. *Id.*

Although not completely apparent from their brief, the Horners argue that Tadych's testimony was neither logically nor legally relevant. As to the first requirement, logical relevance, the Horners assert that Tadych has "absolutely no firsthand knowledge of the events surrounding Misty's death." [Appellants' Brief p. 46.] This argument

38

overlooks a pervasive issue in this case: whether Misty was brainwashed so that she lacked the ability to choose whether to seek medical treatment. Tadych provided testimony as to Misty's indoctrination, including the pre-marital counseling and isolation, into the religious group led by John. Tadych's testimony provided the jury with insight as to whether Misty, at the time of the home birth and at the time of her death, had the capability to choose. Thus, Tadych's testimony was logically relevant.

With respect to the second requirement, legal relevance (which is not preserved for our review), the Horners claim that the Mansfields "only introduced [Tadych's] testimony to indict the past behaviors and statements of Appellant John Horner and paint both Appellants with the same brush." [Appellants' Brief p. 46.] While the Horners make this broad statement, they never explain *how* Tadych's testimony was prejudicial. In other words, the Horners' brief does not explain to what Tadych testified that would result in "danger[] of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence." *Westerman*, 392 S.W.3d at 474. While we can surmise why the Horners consider Tadych's testimony prejudicial, our role is that of a neutral, not an advocate. *See Kenney v. Vansittert*, 277 S.W.3d 713, 722 (Mo. App. W.D. 2008) ("We may not assume the role of advocate for a party by attempting to develop an appellate argument the party has failed to set forth itself." (internal quotation marks omitted)). Thus, we must reject the Horners' contention that Tadych's testimony was legally irrelevant.

The Horners further assert that Tadych's testimony regarding the concepts of "cults" and "brainwashing" was inappropriate because whether a person's free will can be

39

overcome by brainwashing and whether Misty was, in fact, brainwashed, are topics that are properly the subject of expert testimony, not lay testimony. They cite no authority for this proposition. Moreover, the record does not support the premise that the trial court admitted Tadych's testimony as "expert testimony." Rather, in response to a motion in limine filed by the Horners, the trial court denied the Mansfields any ability to use the word "cult" until an adequate foundation was laid. Tadych testified to that foundation based on her personal knowledge. The trial court ruled her testimony was admissible not because it was expert testimony but because her personal experiences and views with regard to the Horners' practices would assist the jury. We cannot find this to be an abuse of discretion.

The Horners' sixth point on appeal is denied.

### Point Seven: Whether Certain Evidence Should Have Been Admitted at Trial

The Horners' seventh point on appeal states:

> The trial court erred in precluding Appellants from introducing *certain evidence* at trial on the grounds that Appellants failed to follow the applicable rules of procedure because introduction of this evidence would not have resulted in unfair disadvantage or surprise to Respondents, in that Respondents acquiesced to any non-response by agreeing to postpone discovery deadlines and then failing to request responses or file a motion to compel, and in any event, Respondents either already had or were furnished the Appellants' evidence prior to trial.

 [Appellants' Brief p. 49.] (Emphasis added.) The point relied on fails to identify what "certain evidence" the trial court excluded.

"A blanket challenge that does not identify a specific [trial] court ruling or action being challenged does not comply with Rule 84.04(d)(1)(A)." *Eagle Star Group, Inc. v.*

40

*Marcus*, 334 S.W.3d 548, 554 (Mo. App. W.D. 2010). If the point relied on does not identify the specific trial court ruling which the appellant deems error, nothing is preserved for appellate review. *Id.* While we can discern from the Horners' seventh point on appeal that they challenge at least one of the trial court's evidentiary rulings, the point relied on is facially defective because it does not identify of which evidentiary ruling the Horners complain. Thus, standing alone, the Horners' seventh point on appeal preserves nothing for review.

Nonetheless, in the argument section following the seventh point, the Horners reference three categories of evidence that they assert were improperly excluded by the trial court: (1) evidence regarding the presence of police officers in Caleb and Misty's home; (2) depositions; and (3) Misty's writings. "'A single point relied on that groups multiple, disparate claims is multifarious, does not comply with Rule 84.04, and generally preserves nothing for appellate review.'" *Rouse v. Cuvelier*, 363 S.W.3d 406, 419 (Mo. App. W.D. 2012) (quoting *Gordon v. Heller*, 352 S.W.3d 411, 413 n.2 (Mo. App. E.D. 2011)). While the Horners should have created a separate point relied on for each category of evidence they argue was improperly excluded, we have chosen to review their claims of error *ex gratia*.

The trial court's decision to exclude evidence, whether as a remedy for discovery violations or because the evidence is inadmissible, will not be disturbed absent an abuse of discretion. *Peterson*, 399 S.W.3d at 869; *Fairbanks v. Weitzman*, 13 S.W.3d 313, 327 (Mo. App. E.D. 2000). The trial court abuses its discretion when the ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable

41

and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Secrist*, 356 S.W.3d at 280. A reversal of the trial court's decision is appropriate only if the error affected the outcome of the trial. *Id.*

### *Presence of Police Officers in Caleb and Misty's Home*

The Horners' first sub point asserts that the trial court "completely barred [the Horners] from testifying concerning the presence of police officers in the home." [Appellants' Brief p. 51.] The Horners clarify that they do not challenge the trial court's decision to exclude evidence regarding the prosecutor's decision not to file criminal charges against Caleb and John. Instead, the Horners claim that they attempted to enter evidence that police officers were present in the home to check on Misty's safety and well being prior to her death, a subject distinct from whether criminal charges were filed against the Horners. The Horners argue that evidence would have demonstrated that Misty had an opportunity to seek professional medical treatment but refused on her own volition.

Prior to trial, the Mansfields filed a motion in limine that asked the trial court to prohibit the Horners and Leathers from introducing evidence regarding the prosecutor's decision not to prosecute. The Mansfields' attorney stated during pre-trial proceedings:

> As Mr. Caleb Horner had alluded to, there was an investigation. Ultimately, for whatever reason, no charges were brought. Obviously, that's a different standard. We're not going to be asking the jury to decide more likely than not what happened in this case. And any police reports, any reference to police investigation, I think would just plant that seed in the jury's mind, and I think it would prejudice them.

The trial court ruled:

> I think the case law is also pretty clear in this area. We're dealing with two different standards. The standard for criminal prosecution is beyond a reasonable doubt. And a prosecution has to be based on that. The standard for a civil case is completely different. So at this point the . . . motion in limine is sustained. There is to be no reference to the decision by the prosecutor's office.

The Horners' point relied on complains about the exclusion of evidence as a "sanction" for their failure to follow applicable rules of procedure. [Appellants' Brief p. 52.] Yet, neither the Mansfields' motion in limine nor the trial court's ruling concerned a sanction for the Horners' failure to participate in discovery or for any other procedural defalcation. The Horners' complaint about the exclusion of this evidence is without merit given the error as to which they complain in their point relied on.

### *Depositions*

The Horners' second sub point argues that they "were wholly precluded from using depositions for any purpose at trial." [Appellants' Brief p. 52.] The Horners give specific examples, claiming that they were precluded "from impeaching Respondent Gail Mansfield with glaringly inconsistent statements she made during her deposition" and "from rehabilitating Caleb's credibility with Caleb's prior deposition testimony." [Appellants' Brief p. 53.]

Rule 57.07(a) concerns the use of depositions:

> Any part of a deposition that is admissible under the rules of evidence applied as though the deponent were testifying in court may be used against any party who was present or represented at the taking of the deposition or who had proper notice thereof. ***Depositions may be used in court for any purpose***.

43

(Emphasis added.)  The Horners' brief, although not clear, indicates that they believe that the emphasized language of Rule 57.07(a) means that a deposition may be used to impeach a witness and to rehabilitate a witness's credibility without any limitation.  We disagree.

Deposition testimony is extrinsic evidence.  *See Mitchell v. Kardesch*, 313 S.W.3d 667, 680 (Mo. banc 2010).

> [P]arties traditionally have been limited in introducing extrinsic evidence when the form of impeachment concerns the witness's prior inconsistent statements or the witness's character for truth and veracity.  They generally may do so when the witness denies the prior statement or specific instance of conduct *only* if the subject of the impeachment is *material* to the issues rather than collateral.

*Id.* at 679-80.  A matter is collateral to the issues "'if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed.'"  *Id.* at 680 (quoting *Black v. State*, 151 S.W.3d 49, 55 (Mo. banc 2004)).

The Horners cite two instances in which Caleb attempted to impeach Gail with her deposition testimony.  In the first instance, Caleb asked Gail whether Misty returned to live with the Mansfields after moving out when she graduated from high school.  After Gail stated that Misty never moved back, Caleb told the trial court, "[A]t this time I'd like to read from Ms. Mansfield's deposition."  The trial court refused to allow Caleb to proceed: "Improper impeachment at this time.  You're not allowed at this time, sir."  Whether Misty returned to live with her parents after moving out has no significance in this case and is collateral.  Thus, the trial court did not abuse its discretion in disallowing Caleb to read from Gail's deposition.

44

In the second instance, the topic of Gail's testimony was an argument that Caleb and Misty had in Gail's presence unrelated to the home delivery. Caleb asked Gail what she heard him say to Misty. Gail responded, "I remember you [Caleb] yelling at her and telling her to shut her mouth." Then Caleb proceeded to tell the trial court that he was "going to ask [Gail] to read from her own deposition." The trial court responded, "No you may not, sir." Caleb did not make an offer of proof, leaving us to guess at what would have been elicited from the deposition. Arguably, any inconsistency in what Caleb said to Misty during an argument unrelated to the home birth is of no significance in this case and is collateral. The trial court did not abuse its discretion in disallowing Caleb to ask Gail to read from her deposition.

The Horners also claim that the trial court erred in refusing to allow the Horners to use Caleb's deposition testimony to rehabilitate Caleb's credibility. "'[W]hen a witness is impeached by proof of an inconsistent statement, relevant evidence of the witness' prior statement consistent with his trial testimony is admissible for the purpose of rehabilitation.'" *Anuhco, Inc. v. Westinghouse Credit Corp.*, 883 S.W.2d 910, 927 (Mo. App. W.D. 1994) (quoting *Broome v. Bi-State Dev. Agency*, 795 S.W.2d 514, 518 (Mo. App. E.D. 1990)). Caleb's testimony was not impeached by prior, inconsistent statements he made in a deposition. Thus, to use his deposition to rehabilitate his testimony was improper. The trial court did not abuse its discretion in disallowing the Horners to use Caleb's deposition testimony to rehabilitate Caleb's credibility.

45

*Misty's Writings*

The Horners' final sub point argues that Misty's journal and letter were the "most important and probative evidence in the whole case [and were] never seen by the jury." [Appellants' Brief p. 54.]  The Horners assert that the trial court abused its discretion in excluding Misty's writings from evidence and in forbidding testimony about her writings on the ground that the writings were not produced during discovery.  The Horners claim that Misty's writings were not requested during discovery and, even if they were, the documents were produced to the Mansfields prior to trial.

The trial court, in response to a motion in limine by the Mansfields, ruled prior to trial that documents not produced during discovery would not be admissible at trial. Caleb then stated, "I'm ready to hand over copies of these very things to them right now," and although it is not apparent from the transcript, presumably gave a copy of Misty's writings to the Mansfields' counsel at that point.  After the Horners' discussion with trial court concerning the motion in limine as it applied to Misty's writings, the Horners never attempted to introduce Misty's writings into evidence.

"When a motion in limine is granted so as to exclude evidence from trial, the party offering the evidence must still offer it at trial in order to preserve the issue for review on appeal."  *Rogers v. Hester ex rel. Mills*, 334 S.W.3d 528, 540 (Mo. App. S.D. 2010). Because the Horners never attempted to introduce Misty's journal or letter into evidence at trial, we conclude that the Horners never preserved this issue for appeal.

The Horners' seventh point on appeal is denied.

46

**Point Eight: Whether the Mansfields' Closing Argument Intentionally Inflamed the Prejudices of the Jury**

The Horners' eighth point on appeal argues that the trial court erred in overruling their motion for a new trial because the Mansfields' counsel "intentionally inflamed the prejudices of the jury, misstated the law, and misstated the evidence" during closing argument. [Appellants' Brief p. 55.] Although the Horners argue that the closing argument, as a whole, was intended to incite prejudice in the jury, the Horners cite several statements made by the Mansfields' counsel that they claim constituted emotional pleas, improper personalizations, character attacks on the Horners, and misstatements of the law. The Horners acknowledge that they did not object at any time during the Mansfields' closing argument and ask for plain error review.

"Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). Not all prejudicial error is plain error. *Rush v. Senior Citizens Nursing Home Dist.*, 212 S.W.3d 155, 163 (Mo. App. W.D. 2006). With respect to a closing argument, the moving party must "'establish[] that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice.'" *Id.* (quoting *State v. Edwards*, 116 S.W.3d 511, 537 (Mo. banc 2003)). In particular, we will find plain error occurred in the closing argument it if "'contains reckless assertions, unwarranted by proof and intended to arouse prejudice, which, therefore, may be found to have caused a miscarriage of justice.'" *Coats v. Hickman*, 11

S.W.3d 798, 805 (Mo. App. W.D. 1999) (quoting *Williams v. Jacobs*, 972 S.W.2d 334, 344 (Mo. App. W.D. 1999)).

"The trial court has broad discretion regarding closing arguments and closing arguments are not viewed in isolation." *Rush*, 212 S.W.3d at 163. Instead, we consider the closing argument with reference to the entire trial. *See id.* (concluding that the claimed error during closing arguments did not constitute a manifest injustice or a miscarriage of justice because the evidence presented during the trial supported the jury's verdict). "'[C]ounsel is accorded wide latitude in arguing facts and drawing inferences from the evidence, and the law indulges a liberal attitude toward closing argument.'" *Morgan Publ'ns, Inc. v. Squire Publishers, Inc.*, 26 S.W.3d 164, 170 (Mo. App. W.D. 2000) (quoting *Rhodus v. Wheeler*, 927 S.W.2d 433, 437 (Mo. App. W.D. 1996)).

The Horners cite several statements made by the Mansfields' attorney during closing argument that they claim constituted plain error:

And there are a lot of children counting on me.

I cannot put them jail. That's where they belong. But I don't have that power. All I can do is ask you not to let them get away with it, to hold them responsible.

All these people tried to save her. They said, you people are crazy, you're a cult, you're brainwashers; you're killing this girl; you're killing babies.

Karen Tadych explained to you how they work. It's a slow, progressive manipulation.

They said that there were people who talked to Misty throughout the 31 days. They said there was an EMT. Where was that EMT? Where was that document? It is a lie. A lie is a lie and they are professional liars. That's what a charlatan is, a con artist. He is a snake oil salesman of the lowest kind because he is not making money on it; he is killing people.

48

She's a scared little girl. And this monster tells her, no, I'm the man, God says I decide.

And at 6-6 I've never seen such a small man. Excuse me, 6-10. They think women are second rate citizens.

Because they killed her. They killed her. For thirty-one (31) days, as sepsis and infection ate away at organ, after organ, after organ as that little girl died, and they watched it.

[T]hese monsters used her as a spiritual guinea pig.

John Horner has never delivered a baby. He has killed a few, but he hasn't delivered one.

[T]hat baby didn't call a cop, didn't call paramedic. That baby died in delivery of asphyxiation. What a terrible, disgusting way for a baby to come into this world.

It all started with John. Karen Tadych told you that. This is all his idea. Caleb didn't even always believe it. Karen Tadych told you the slow manipulation process that he used.

What a despicable horrible human being.

Misty was taking scripture from these monsters.

Baby after baby after baby after baby after baby after baby. Let's get him out of our community! Put him out of business, because Karen Tadych told you, he will not stop. He is doing it in Mexico now. God only knows what atrocities he is committing down there. God only knows.

[P]ut them out of the business.

We've got some quacks over in Kansas called the Phelps family. . . . as much as those people sicken me, they're not anywhere as dangerous as these people. . . . There are few cults in the country as dangerous as this man. . . . A modern day Jim Jones is what he is. He thinks he is the Messiah.

Punish him. I cannot put him in jail. I so wish I could.

Watching them this week, crying on the stand, reminding me of watching law and order when the killer is on the stand crying.

At this time, I usually say, please give defense counsel the same respect and deference you've given me.  It would be a lie.

[Appellants' Brief pp. 56-58.]  The Horners cite five additional statements they claim were improperly made during the Mansfields' rebuttal argument:

I've got a baby due Tuesday.  Let me tell you what would happen.  Let me tell you what would happen if I was in this guy's position.

What a phony . . . what a phony.  What an absolute fraud this man is to try and tell you it started in her uterus.

If somebody starts deliberating about freedom of religion, you've got to tell them, that's not in the instructions. . . . This is not a freedom-of-religion case.

What an absolute sociopath.

Whether defined by the books as a cult, that's what they do.  They isolate; they brainwash; they preclude; they teach.

[Appellants' Brief pp. 58-59.]  The Horners do not, with three exceptions discussed *infra*, identify which of these statements constituted emotional pleas, which of these statements constituted improper characterizations, which of these statements constituted character attacks on the Horners, and which of these statements constituted misstatements of the law.  While we can surmise which statements fall into each category, to do so would require us to assume the role of advocate and develop the Horners' appellate argument.  Our role as a neutral reviewing court forbids us from acting as an advocate.  *See Kenney*, 277 S.W.3d at 722.  Thus, the Horners have not adequately demonstrated that any of these statements alone entitle the Horners to plain error review.

The Horners specify the alleged delinquencies of three statements they cited in their brief.  They argue: (1) "[The] references to Jim Jones and Fred Phelps are

50

unjustifiable. Few people in the world incite prejudice like these infamous cult leaders." (2) "[The Mansfields'] Counsel engaged in improper personalization when he spoke about the fact that he was expecting a baby, and proceeded to insinuate that, if he were in [Darrell's] position, he would commit acts of violence against [the Horners]." (3) "[The Mansfields'] Counsel clearly misstated the law when he asked the jury, in the context of actual damages, to 'put [the Horners] out of business.'" We disagree. None of these statements resulted in plain error causing "manifest injustice or miscarriage of justice."

The first statement of which the Horners specifically complain is the comparison -- and, therefore, improper characterization -- of the Horners to Jim Jones and Fred Phelps. In *Gaffney v. Community Federal Savings & Loan Ass'n*, the Eastern District concluded that the trial court did not abuse its discretion when it overruled the defendants' objection during closing argument to the plaintiff's characterization of the defendants as "poor people" and as "little people." 706 S.W.2d 530, 536 (Mo. App. E.D. 1986). Because we are reviewing for plain error, our review of the statements concerning Jim Jones and Fred Phelps is more stringent. There was evidence presented at trial that John, in particular, was the leader of a religious group and that Caleb actively participated in the group, and as discussed *supra*, there was sufficient evidence presented at trial to support the jury's verdict. Thus, we cannot conclude that the comparison of the Horners to two notorious religious leaders, while potentially objectionable, resulted in manifest injustice or a miscarriage of justice.

The second statement of which the Horners specifically complain is the statement made during the rebuttal argument that the Mansfields' counsel was expecting a baby.

51

The Horners assert that the statement insinuates that the Mansfields' counsel would intentionally harm the Horners if something similar happened in his situation so that it was an improper personalization. The Horners fail to read the statement in context of the rebuttal argument. At the point the Mansfields' counsel made the statement, he was asking the jury to sign the verdict form finding the Horners negligent and award aggravating circumstance damages. Thus, the insinuation was that, if he were a juror, he would find liability and award damages. Even if the Horners' claim that the statement insinuated intentional harm is correct, the statement did not constitute an improper personalization. Improper personalization occurs when the closing argument asks the jury to place themselves in the place of the party. *Rhodus*, 927 S.W.2d at 437. The Mansfields' attorney did not ask the jurors to place themselves in the place of the Mansfields. We cannot conclude the statement about the Mansfields' attorney expecting a baby resulted in manifest injustice or a miscarriage of justice.

The third statement of which the Horners specifically complain is the suggestion "to put [the Horners] out of business." The Horners argue it is a misstatement of law. The Horners assert that "it is not a legitimate function of compensatory or punitive damages to 'put someone out of business.'" While we agree that "putting someone out of business" is not the purpose of compensatory damages, we disagree that it is not within the purview of damages for aggravating circumstances in wrongful death cases. The purpose of damages for aggravating circumstances, like the purpose for punitive damages, is "'to inflict punishment and to serve as an example and a deterrent to similar conduct.'" *Hess v. Chase Manhattan Bank*, 220 S.W.3d 758, 771 (Mo. banc 2007)

52

(quoting *Call*, 925 S.W.2d at 849). "Putting someone out of business" is a colloquial expression for preventing someone from engaging in similar conduct in the future. Accordingly, we do not find that the Mansfields' attorney misstated the law to the jury so that manifest injustice or a miscarriage of justice resulted.

In addition to the three statements made during closing arguments that the Horners specifically challenge, the Horners contend that the cumulative effect of the Mansfields' closing argument was to engender the jury's hatred, passion, and prejudice. As we did in *Rush*, we reviewed the record and, as discussed *supra*, concluded that there was sufficient probative evidence presented at trial to support the jury's verdict. Thus, we do not find that the outcome of the trial was affected by the cumulative effect of the Mansfields' closing argument so as to amount to manifest injustice or a miscarriage of justice.

The Horners eighth point on appeal is denied.

**Point Nine: Whether Section 510.265 Is Applicable So That Remittitur Is Necessary**

The Horners' ninth and final point on appeal argues that the trial court erred in overruling their motion for remittitur. The Horners assert that section 510.265, Missouri's statutory cap on punitive damages, applies to limit damages for aggravating circumstances that are awarded in wrongful death cases. This is a question of first impression.

Section 510.265 provides, in relevant part, that:

1. No award of ***punitive damages*** against any defendant shall exceed the greater of:

(1) Five hundred thousand dollars; or

53

(2) Five times the net amount of the judgment awarded to the plaintiff against the defendant.

(Emphasis added.) "Punitive damages" is not defined in section 510.265.

Statutory interpretation is a question of law, which is subject to *de novo* review on appeal. *Hervey v. Mo. Dep't of Corrections*, 379 S.W.3d 156, 163 (Mo. banc 2012). "'The primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning.'" *Id.* (quoting *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009)). "Absent statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999). However, where the legislature has defined a term in one statute, its failure to do so in another may be instructive on the subject of intent. *See, e.g.*, *Hudson v. Dir. of Revenue*, 216 S.W.3d 216, 223-24 (Mo. App. W.D. 2007) (holding that by including a "knowledge" element in two sections of a statute, "the legislature demonstrated that it knew how to express its intent to require a knowledge element," rendering the absence of the element in another statute supportive of "the inference that the legislature did not intend for there to be a knowledge element"); *State v. Bouse*, 150 S.W.3d 326, 330-31 (Mo. App. W.D. 2004) (holding that legislature's failure to qualify a definition though it knew how to do so is instructive in construing statute's intended meaning).

As discussed *supra*, section 510.263 generally addresses trial procedures in cases where punitive damage awards are sought. Subsection 510.263.6 provides, in pertinent part, that: "[t]he doctrines of remittitur and additur, based on the trial judge's assessment of the totality of the surrounding circumstances, shall apply to punitive damage awards." As we have observed, this section of Chapter 510 effectively codifies a trial court's obligation upon request to assess the extent to which such a punitive damage award comports with due process. (*See supra* discussion of point relied on three).

Unlike section 510.265, section 510.263 includes a statutory definition for "punitive damage awards." Subsection 510.263.7 provides that: "***As used in this section***, 'punitive damage award' means an award for punitive or exemplary damages ***or an award for aggravating circumstances***." (Emphasis added.) The statutory definition of "punitive damage award" in section 510.263.7 is instructive. It solidifies that the legislature: (i) understands that aggravating circumstances damages are not synonymous with punitive damages as a matter of course; and (ii) plainly knows how to write legislation to express its intent to include aggravating circumstances within the scope of "punitive damages" if that is intended.

The Horners argue that the definition of "punitive damage award" in section 510.263.7 should be applied to the term "punitive damages" as used in section 510.265. To do so, however, would either render the phrase "[a]s used in this section" in section 510.263.7 superfluous or would require us to rewrite the phrase to "as used in this chapter." We are not permitted to do either. It is "'presumed that the legislature did not insert idle verbiage or superfluous language in a statute.'" *Civil Serv. Comm'n v. Bd. of*

55

*Alderman*, 92 S.W.3d 785, 788 (Mo. banc 2003) (quoting *Hyde Park Housing P'ship v. Dir. of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993)). And it is a longstanding principle in this state that "[a] court has no authority to write into a statute a provision not covered by its language." *State ex rel. Am. Asphalt Roof Corp. v. Trimble*, 44 S.W.2d 1103, 1105 (Mo. banc 1931).

These principles are particularly controlling here. Section 510.263 was amended to add subsection 510.263.7 at the same time that section 510.265 was enacted in 2005 as a part of House Bill 393. It is thus impossible to characterize the addition of a definition of "punitive damage awards" in, and applicable only to, section 510.263 at the same time section 510.265 was enacted without a definition of "punitive damages" as anything other than purposeful. We thus conclude that the legislature's reference to "punitive damages" in section 510.265 was not intended to include aggravating circumstances damages within its scope. Moreover, sections 510.263 and 510.265 will not be in conflict if different definitions of "punitive damage awards" and "punitive damages" apply. Section 510.263 addresses trial procedures when "punitive damage awards" are claimed and, by the operation of section 510.263.7, makes it clear that those procedures are equally available where aggravating circumstances damages are claimed. Section 510.265 purports to establish a statutory cap on "punitive damages." The statues can plainly operate without being in conflict, even though section 510.263 will apply to aggravating circumstances damages while section 510.265 will not.

The Horners counter that because case law has declared damages for aggravating circumstances to be the functional equivalent of punitive damages, the term "punitive

damages" in section 510.265 must be construed to include damages for aggravating circumstances within its scope. We disagree. It is true that in *Call v. Heard*, our Supreme Court stated that: "[A]ggravating circumstance damages in wrongful death cases are the equivalent of punitive damages." 925 S.W.2d at 849 (citing *Bennett v. Owens-Corning Fiberglas Corp.*, 896 S.W.2d 464, 466 (Mo. banc 1995))). The comparison of aggravating circumstances damages to punitive damages was limited in both cases, however, to determining whether damages for aggravating circumstances are subject to due process considerations. *Id.*; *Bennett*, 896 S.W.2d at 465-66. The limited context of these holdings does not support the broad conclusion that our courts have defined "punitive damages" to include "aggravating circumstance damages" as a matter of law.

We are mindful that "'the legislature is presumed to know the existing law when enacting a new piece of legislation." *State ex rel. Nothum v. Walsh*, 380 S.W.3d 557, 567 (Mo. banc 2012). This principle actually mitigates in favor of our conclusion that section 510.265 was not intended to include aggravating circumstances damages within its scope. Subsection 510.263.7 effectively codified the limited holdings in *Call* and *Bennett* by defining "punitive damage awards" to include "aggravating circumstance damages" for trial procedure purposes, including remittitur motions requiring the assessment of punitive damages award by "the totality of the surrounding circumstances," a due process consideration. The failure to include the same definition for "punitive damages" in section 510.265 or to otherwise reference aggravating circumstances suggests a

purposeful intent to exclude aggravating circumstances damages from the scope of section 510.265.

Our conclusion recognizes, and affords appropriate deference to, the fact that a wrongful death action is purely a creature of statute. *Sanders*, 364 S.W.3d at 203. The Wrongful Death Act, sections 537.080-537.100, was designed to "mend the fabric of the common law, not to weaken it." *O'Grady v. Brown*, 654 S.W.2d 904, 908 (Mo. banc 1983). Though the legislature was plainly familiar with the term "punitive damages" when it enacted the wrongful death statute, it elected to use the phrase "aggravating circumstances" to define damages that could be awarded in addition to compensatory damages. We are required to attach significance to that choice in verbiage. It is not for this court to summarily conclude that "aggravating circumstance awards" and "punitive damages" are statutory synonyms.

Instead, "we must . . . apply the statutory language [in the wrongful death statute] 'with a view to promoting the apparent object of the legislative enactment.'" *Id.* (quoting *United Airlines v. State Tax Comm'n*, 377 S.W.2d 444, 451 (Mo. banc 1964)). The Wrongful Death Act has three objectives: "to provide compensation to bereaved plaintiffs for their loss, to ensure that tortfeasors pay for the consequences of their actions, and generally to deter harmful conduct which might lead to death." *Id.* at 909. The last objective is the focus of section 510.090's allowance for aggravating circumstance damages: to deter harmful conduct which might lead to death. It is logical and sound that the legislature viewed conduct leading to death as worthy of more serious consequence than other conduct. If section 510.265 is construed to apply to damages for aggravating

58

circumstances without a plain and clear legislative directive to do so, we will be tempering the means by which an objective of section 510.090 is met. More to the point, we will be effectively modifying a statutory cause of action, including the damages expressly authorized by the legislature for that cause of action. *Sanders*, 364 S.W.3d at 203 ("The legislature has the power to define the remedy available if it creates the cause of action."). In fact, it is noteworthy and controlling that where the legislature has intended to limit the damages recoverable under the wrongful death statute, it has done so expressly. *See* section 538.210 (limiting non-economic damages in actions against health care providers "for personal injury *or death*") (emphasis added).

Accordingly, the Horners' ninth point on appeal is denied.

## Conclusion

The Judgment of the trial court is affirmed.


_____
Cynthia L. Martin, Judge


All concur