Patricia Rowe KERR, Respondent,

v.

MISSOURI VETERANS
COMMISSION, et al.,
Appellants.

WD 80274

Missouri Court of Appeals,
Western District.

OPINION FILED: October 31, 2017

Jerome J. Dobson, Gregory A. Rich, and Nicole A. Matlock, St. Louis, MO, Attorneys for Respondent.

Joshua D. Hawley, Attorney General, Jefferson City, MO, and Jason S. Dunkel, Assistant Deputy Attorney General, St. Louis, MO, Attorneys for Appellants.

Before Division One: Cynthia L. Martin, Presiding Judge, and James Edward Welsh and Karen King Mitchell, Judges

Karen King Mitchell, Judge

█ The Missouri Veterans Commission, Executive Director Larry Kay, the Missouri Department of Public Safety, and the State of Missouri (collectively "MVC")

appeal from a judgment, entered upon a jury verdict, finding them liable for both sex and age discrimination, as well as retaliation, against former employee Patricia Rowe Kerr, all in violation of the Missouri Human Rights Act (MHRA),[1] for which the jury awarded Kerr both compensatory and punitive damages totaling $2,875,000. MVC raises five points on appeal, arguing that (1) Kerr failed to exhaust her administrative remedies regarding her claim of retaliation (Point I), (2) the court erred in excluding certain evidence (Points II-IV), and (3) the court erred in admitting "me too" evidence offered by Kerr (Point V). Finding no error, we affirm. We also grant Kerr's motion for appellate attorney's fees, which was taken with the case.

### Background [2]

Kerr began working with veterans as a volunteer in 2003. She helped create several Support Your Troops events in Jefferson City, Missouri, to connect military families to each other and to support resources. Following these events, Kerr was contacted by MVC and asked if she would help out with one of its events—a Supermarket of Veterans Benefits. After this event, both the Executive Director (Ron Taylor) and the Deputy Director (Hal Dulle) of MVC asked Kerr if she would consider working for MVC. Taylor and Dulle wanted to create an outreach position through MVC to both educate and help new veterans navigate the benefits system and to seek out and locate underserved veteran populations. Kerr agreed and began working for MVC as a Veterans Benefits Specialist on July 1, 2004.

---

1. § 213.010 et seq. All statutory citations are to the Revised Statutes of Missouri 2016, unless otherwise noted.

2. "Our standard of review requires that we view the facts in the light most favorable to the ... verdict and accept as true evidence and inferences favorable to the ... judgment while disregarding contrary evidence." *McGhee v. Schreiber Foods, Inc.*, 502 S.W.3d 658, 662 n.1 (Mo. App. W.D. 2016) (quoting *Higgins v. Ferrari*, 474 S.W.3d 630, 639 (Mo. App. W.D. 2015)).

Taylor and Dulle advised Kerr that they wanted to create an ombudsman position within MVC and enlisted her help in doing so. Through Kerr's assistance, MVC was able to create a permanent ombudsman position at MVC and offered the position to Kerr. The ombudsman position encompassed two roles: (1) directing Operation Outreach, which worked directly with veterans to educate and advocate for them regarding available benefits and resources and (2) working with legislators, communities, and state agencies to provide education and advocate on behalf of veterans. By all accounts, Kerr excelled at both roles and received awards and recognition both locally and nationally.

In October 2006, Taylor retired and Dulle was promoted to Executive Director of MVC; at the same time, Larry Kay was hired as Deputy Director. Just after Kay was hired, he told Kerr there were "generational differences" between them and asked Kerr when she planned to retire. In June 2007, Kerr was engaged in a fundraising effort for a veteran's family whose infant child needed heart surgery. On June 28, 2007, five days after praising Kerr's performance to a Brigadier General in the Army, Kay placed Kerr on a performance improvement plan and issued her a conditional letter of employment purportedly based upon acts of insubordination.[3] The letter stated:

> This is being taken due to your insubordination, specifically your failure to comply with your supervisor's directive not to proceed with the fundraising effort prior to clarification from the Missouri Veterans Commission's accountant and your failure to stop the fundraising ef-

fort after being questioned by a subordinate regarding concerns of the legality and propriety of the situation.

Kerr's subordinate had questioned whether it was legal for MVC to engage in fundraising for individual service members. Kerr responded that, after reading the MVC enabling statute, discussing the matter with the Commissioners of the MVC and two different executive directors, it was her understanding that it was, in fact, legal to do so. Kay subsequently advised Kerr not to proceed with the effort until she had discussed the legality of the matter with the fiscal and administrative manager for MVC (who was also the sister-in-law of Kerr's subordinate).[4] Though Kerr made multiple attempts to contact the fiscal and administrative manager, she was unable to reach her and never received any response to messages left. After receiving the conditional letter of employment, Kerr was forced to return $13,000 in donations she had collected on behalf of the family to the original donors. When Kerr asked Kay why she was being disciplined based upon an alleged failure to comply with a subordinate's request, Kay advised her that he wanted her to experience "shock and awe."

The following month—August 2007—Dulle asked Kerr to represent MVC at the Governor's Annual Ham Breakfast. After learning of Dulle's request, Kay approached Kerr in the parking lot, demanding to know why Dulle chose Kerr rather than Kay. Kay advised Kerr that she would not be attending because she was on "triple secret probation" (presumably referencing her conditional employment let-

---

**3.** This was not Kay's first effort to have Kerr's employment terminated. He also sought to have her employment terminated after she spoke with a family friend who happened to be Kay's commanding officer in the National Guard.

**4.** It was unclear why Kay referred Kerr to a fiscal officer with no legal training, rather than the general counsel for MVC, to consult on a legal question.

ter) and that Kay and another male staff member would be attending instead.

Shortly thereafter, it was announced that 1,100 Missouri National Guard members, including Kay, would be deployed to Kosovo in the KFOR-10 peacekeeping mission. Accordingly, from January 2008 through May 2009, Kay took a leave of absence from MVC to serve as the commanding officer in the KFOR-10 peacekeeping mission in Kosovo.

In August 2008, while Kay was deployed, Dulle stepped down as Executive Director and Kay was appointed as the new Executive Director. But because Kay was still deployed, MVC appointed an interim Executive Director until Kay's return. Kay officially took over the Executive Director position on June 1, 2009.

Upon Kay's return, he advised Kerr that he wanted to split her job into two positions: State Veterans Ombudsman and Director of Operation Outreach. Kay advised Kerr that she needed to select which of the two positions she wanted to retain. Though Kay told Kerr that she had the option to choose which position to take, he frequently and repeatedly pressured her to choose the outreach position. Kerr disagreed with Kay's decision to split the position, believing that the legislature intended for there to be a single position encompassing both roles. Kay became angry with Kerr and called her on a regular basis over the course of the next month to berate and intimidate her into taking the outreach position. Many of Kay's abusive phone calls to Kerr were witnessed by Kerr's husband, coworkers, and others. Finally, on July 2, 2009, Kerr relented and accepted the outreach position after seeking and receiving assurances from Kay that her job would be secure. (Kerr was concerned about losing her job because she was the primary wage-earner in her household and her husband had serious medical issues from a prior debilitating car accident.)

As part of Kerr's newly divided position as Director of Operation Outreach, Kay wanted her to establish a listening post program. The listening posts were meant to serve as town-hall-like meetings, where MVC went out to the communities and literally listened to the veterans' needs and provided them with experts to talk about jobs, access to health care, and education. Kerr arranged and hosted 21 listening posts throughout the state in a span of six weeks from September 14, 2009, through October 28, 2009. On October 8, 2009, the morning of a listening post in Cape Girardeau, Kerr was having breakfast with an MVC employee when Kay approached and appeared very angry. The other employee left and Kay sat down with Kerr; Kay's fists were clenched, his face was red, and his body was tense. Kay told Kerr he was going to fire her on October 28, the date of the last scheduled listening post. He said, "If you think you can take me on, go ahead. The governor is not going to choose between you and me, a returning war hero." Kay advised Kerr to "aggressively look for another job." When Kerr asked what was wrong, Kay just said, "I want you to aggressively look for another job, but I don't want you to talk to anyone else outside the Commission."

On the day of the last listening post, Kay angrily approached Kerr while she was getting a drink and said, "We might as well just get this over with and go out back." This frightened Kerr, as she did not understand why Kay was so angry with her.

On November 10, 2009, a meeting of the MVC Commissioners was held, and Kerr prepared an outreach report for the meeting and attended the open session. After the open session, the Commissioners went into closed session and Kerr went back to

her office. At 4:00 p.m., Kay returned from the closed session and asked Kerr to come into his office, along with Bryan Hunt, the deputy director. Kay then handed Kerr a letter advising her that she was being terminated, effective at 5:00 p.m. that day. Kay told Kerr that she needed to clean out her office the next day, which was Veterans' Day. On the same day, Kay also terminated Anne Payne, a woman over forty years old, who had been the superintendent of homes. When Kerr asked Kay what she should tell people when asked why she was terminated, Kay advised, "Tell them it is for budget cuts and restructuring."

Following her termination, Kerr attempted to stay involved in helping veterans and made efforts to network in hopes of finding another job in the same field. In January or February of 2010, Kerr learned that Dr. Marjorie Sable, the Dean of the School of Social Work at the University of Missouri, was planning a veterans outreach conference, scheduled for November 2010, and Kerr joined the planning committee. Kerr suggested that Dr. Sable involve MVC in the planning committee and the conference.

On May 6, 2010, Kerr filed a charge of discrimination with the Missouri Commission on Human Rights (MCHR), alleging age and sex discrimination against MVC, Kay, and Hunt.

On May 24, 2010, Kerr filed an amended charge of discrimination against MVC, alleging retaliation in addition to age and sex discrimination as a result of a phone call she received that morning from Dr. Sable. In the phone call, Dr. Sable asked Kerr to step down from the veterans conference planning committee, as Kay had told Dr. Sable that, because of pending litigation, if Kerr were on the planning committee, MVC would withdraw its support for the conference.

After receiving right-to-sue letters in response to her original and amended charges of discrimination, Kerr filed suit on July 1, 2011, against MVC and Kay (later adding the Department of Public Safety and the State of Missouri as defendants), alleging violations of the MHRA by age and sex discrimination, as well as retaliation.

In October of 2011, Kerr, along with Colonel Michael Fayette, attended a public meeting about veterans' issues in Odessa, Missouri, on behalf of the Forty and Eight, a group belonging to the American Legion. Kay was speaking at the event, and when he finished, he opened up the floor to the audience for questions. Kerr raised her hand to ask a question; Kay called on all the men, then made some more statements before seeking suggestions from the audience. Kerr raised her hand again; Kay again called on everyone but Kerr. When Kerr was the last person with her hand raised, Kay finally acknowledged her, and Kerr offered a helpful suggestion, prompting questions from those around her. Shortly thereafter, Kay stated, "Guys, this lady has a lawsuit against me and I'm not comfortable and I'm leaving," and he walked out. Kerr was embarrassed and humiliated.

During the trial on Kerr's petition, she presented evidence of derogatory statements made by both Kay and Hunt, indicating things such as a need to "weed out the old people," "women can't do men's jobs," and "we don't like women with white hair." She also presented evidence that, during Kay's tenure as Executive Director of MVC, other women were removed from authority positions and replaced by men. Kerr also introduced evidence refuting Kay's assertion that her position was cut solely as a result of budget constraints, such as the facts that, during the same time frame, Kay provided over $76,000 in

raises to three male employees, there was a vacant position at MVC with an appropriated salary of $74,393, and a vacancy created by a retiring employee who made between $35,000 and $45,000 was not going to be filled. Kerr further introduced evidence that Kay belittled and berated high-ranking female officers working below him during his time in Kosovo and replaced many of them with men as well.

Upon the conclusion of evidence, the jury found in favor of Kerr and awarded a total of $2,875,000 in compensatory and punitive damages. MVC appeals.

### Analysis

MVC raises five points on appeal. The first point argues that the court erred in including Kay's actions during the Odessa veterans event in the verdict director on retaliation insofar as Kerr allegedly failed to exhaust her administrative remedies regarding this incident by failing to include it in either of her charges of discrimination. The second through fourth points claim error in the exclusion of evidence that MVC claims was relevant to Kerr's motive to file the lawsuit and would have impeached Kerr's credibility by contradicting her testimony regarding her relationship with Kay and his actions toward her. The fifth and final point argues that the court erred in admitting "me too" evidence from several soldiers deployed with Kay in Kosovo because it was unfairly prejudicial. Finding no error, we affirm.

**A. MVC waived any challenge to Kerr's alleged failure to exhaust administrative remedies.**

In its first point, MVC argues that the trial court erred by including Kay's acts during the Odessa veterans event (the Odessa incident) in the retaliation verdict director because, MVC argues, Kerr failed to exhaust her administrative remedies regarding this incident by not including it within either of her charges of discrimination. Kerr argues that (1) MVC waived this challenge by failing to object to any evidence of the Odessa incident; (2) even if preserved, MVC's claim is without merit insofar as the Odessa incident was "like or reasonably related" to the University of Missouri incident, which was included in the amended charge of discrimination; and (3) the issue of retaliation in the Odessa incident was tried by consent.[5] We agree with Kerr.

During trial, Kerr submitted Instruction Number 12, a verdict director on her claim of retaliation, which advised the jurors as follows:

> In Verdict B, on Plaintiff's claim of retaliation, your verdict must be for Plaintiff if you believe:
>
> First, either Defendant Larry Kay interfered with Plaintiff's participation on the planning committee for the Veterans Summit at the University of Missouri School of Social Work, *or Defendant Larry Kay refused to answer Plaintiff's questions at the town hall meeting in Odessa, Missouri, and pointed out that she had filed a lawsuit against him* and,
>
> Second, Plaintiff's complaint of discrimination was a contributing factor in any one or more of Defendant Larry Kay's

---

5. We do not address Kerr's argument regarding trial by consent, as MVC's Point Relied On is limited to a challenge based upon Kerr's alleged failure to exhaust administrative remedies as a direct consequence of her failure to raise the Odessa incident in either of her charges of discrimination. MVC's Point Relied On did not claim that the instruction was erroneous as a result of the Odessa incident not being included in the amended petition. Accordingly, it is irrelevant to the point on appeal whether the Odessa incident was tried by consent.

conduct as submitted in paragraph first and,

Third, as a direct result of such conduct Plaintiff sustained damage.

(Emphasis added.) MVC argues that the italicized portion of the instruction should not have been submitted because neither of Kerr's charges of discrimination included information about this claim; thus, MVC argues, Kerr failed to exhaust her administrative remedies on this claim and was barred from seeking relief in the circuit court.

▮ "[Before] any suit in circuit court, a complainant under the MHRA is required to file a complaint with the MCHR in order to give the agency the opportunity to determine the validity of the claim, to investigate, and to determine if there is probable cause that discrimination has taken place." *State ex rel. Washington Univ. v. Richardson*, 396 S.W.3d 387, 397 (Mo. App. W.D. 2013). "Section 213.075.1 states that a charge filed with the MCHR, within 180 days of the alleged act of discrimination, shall 'set forth the particulars' of the unlawful discriminatory practice." *Reed v. McDonald's Corp.*, 363 S.W.3d 134, 143 (Mo. App. E.D. 2012) (quoting § 213.075.1). "In order to exhaust all administrative remedies, the claimant must give notice of all claims in the administrative complaint." *Id.* Though "exhaustion requires a claimant to give notice of all claims of discrimination in the administrative complaint, ... administrative complaints are interpreted liberally in an effort to further the remedial purposes of legislation that prohibits unlawful employment practices." *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 525 (Mo. App. E.D. 2009). "As a result, administrative remedies are deemed exhausted as to all incidents of discrimination that are like or reasonably related to the allegations of the administrative charge." *Id.* "Further, the scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Id.*

▮ At no point during trial did MVC object to evidence pertaining to the Odessa incident. In fact, it was not until the instruction conference that MVC voiced any issue with evidence of the Odessa incident. And, even then, the only objection raised was that the Odessa incident had not been included in an amended charge of discrimination; MVC denied any complaints related to whether it was on notice of the claim.

[W]hile it is true that the failure to exhaust administrative remedies has historically been characterized as an issue of subject matter jurisdiction, the Missouri Supreme Court clarified in [*J.C.W. ex rel.*] *Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009), and *McCracken v. Wal-Mart Stores E., L.P.*, 298 S.W.3d 473 (Mo. banc 2009), that Missouri trial courts have subject matter jurisdiction over all cases and matters, civil and criminal.

*Whithaus v. Curators of Univ. of Mo.*, 347 S.W.3d 102, 104 (Mo. App. W.D. 2011). Thus, the failure to exhaust administrative remedies is no longer to be understood in terms of subject matter jurisdiction; "[i]t should now be understood as a matter of limits on the court's authority." *Shafinia v. Nash*, 372 S.W.3d 490, 495 (Mo. App. W.D. 2012).

▮ "The distinction between whether the circuit court has subject matter jurisdiction or the statutory authority to proceed is more than a semantic one." *Evans v. Empire Dist. Elec. Co.*, 346 S.W.3d 313, 316 (Mo. App. W.D. 2011). "Subject matter jurisdiction cannot be waived and can be addressed for the first time during trial or on appeal." *Id.* "Whether the trial court has the statutory

right to proceed[, however,] is not a matter of subject matter jurisdiction but a matter of trial error that is waived by the parties if an objection is not brought before the trial court." *Id.* at 316 n.3; *see also McCracken*, 298 S.W.3d at 477 ("non-jurisdictional defenses that might bar relief— such as claims that ... a statutory prerequisite to suit has not been met—... are subject to waiver if not raised ... as ... permitted by Missouri's rules and case law").

■ By not objecting to any evidence pertaining to the Odessa incident, MVC waived the right to challenge the court's alleged lack of authority to proceed resulting from Kerr's failure to exhaust her administrative remedies. And, because "a party is entitled to an instruction upon any theory supported by the evidence," *Cluck v. Union P. R.R. Co.*, 367 S.W.3d 25, 33 (Mo. banc 2012), the court committed no error in instructing the jury on the Odessa incident.

■ In any event, even a timely objection would not have been meritorious. In response to MVC's objection to the instruction, the court determined that the Odessa events were like or reasonably related to the allegations in Kerr's charges of discrimination. This finding was not erroneous.

■ "The purpose of requiring parties to file a charge" of discrimination "is to give the charged party notice of the claim, to give the [investigating agency] the opportunity to settle the dispute, and to narrow the issues for prompt adjudication." *Smith v. Jupiter Aluminum Corp.*, 2:09-CV-356, 2011 WL 197577, at *3 (N.D. Ind. Jan. 18, 2011) (citing *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)). "A claim is 'like or reasonably related' to the ... charge [of discrimination] ... if there is a factual relationship between them." *Id.* (quoting *Horwitz v. Sterling Miami, Inc.*, 97-C-6322, 1998 WL 245883, at *2 (N.D. Ill. May 4, 1998)).

Here, both incidents involved veterans events where Kay refused to participate in response to Kerr's involvement on the basis of her complaints of discrimination. Both events caused Kerr embarrassment and humiliation. And MVC was not surprised by the Odessa allegations, as it expressly denied any claimed lack of notice as the basis for its objection.

Similarly, in *Smith*, the court found distinct acts of alleged retaliation to be "like or reasonably related" because the complainant's initial EEOC charge alleged retaliatory discharge, and "additional acts of retaliation [we]re the logical outgrowth of [the complainant's] initial charge for retaliation." *Id.* at *4. Therefore, the court concluded, any "additional documents and witness statements contained in the EEOC file that relate[d] to *any* form of retaliatory conduct by [Employer] c[ould] be taken into consideration." *Id.* at *5 (emphasis added).

MVC relies heavily on *Farrow v. St. Francis Medical Center*, 407 S.W.3d 579 (Mo. banc 2013), in arguing that the Odessa incident was not like or reasonably related to the University of Missouri incident. *Farrow*, however, is distinguishable insofar as the two claims at issue were not like or reasonably related because "[t]he charge of discrimination contain[ed] no allegations whatsoever that would put [Employer] on notice that [the complainant] intended to raise additional claims regarding [post-termination] retaliation for its treatment of her while she sought relief under [Employer's] internal grievance procedure." *Id.* at 594. Instead, the charge of discrimination "clearly indicated [the complainant] limited the scope of her claim to the events that occurred prior to her ... discharge." *Id.* Here, both the

Odessa incident and the University of Missouri incident involved similar claims of post-termination retaliation, and MVC expressly denied any claim of insufficient notice of the Odessa incident. Thus, *Farrow* is inapposite.

Point I is denied.[6]

**B. The trial court did not err in excluding evidence pertaining to the relationship between Kerr and Kay.**

In its second point on appeal, MVC argues that the court abused its discretion in excluding evidence of a voicemail left for Kay by Kerr in which Kerr told Kay that she loved him because, MVC argues, this evidence proved Kerr's allegedly improper motive in filing the lawsuit. In its third point on appeal, MVC argues that the court abused its discretion in excluding evidence of an alleged report made by Kay against Kerr to MVC human resources because, MVC argues, this evidence would have refuted Kerr's evidence that Kay harbored animus toward older women. And, in its fourth point, MVC argues that the court abused its discretion in excluding the voicemail, the alleged human resources report, and various statements made by Kerr to Kay over Skype because, MVC argues, this evidence was relevant to Kerr's credibility as a witness. Because some of the claims of evidentiary error were not preserved, and because as to claims of error that were properly preserved, none of the evidence satisfied the

tests for both logical and legal relevance, we disagree.

"To be admissible, evidence must be both logically relevant and legally relevant." *Frazier v. City of Kansas City*, 467 S.W.3d 327, 338 (Mo. App. W.D. 2015) (quoting *Mansfield v. Horner*, 443 S.W.3d 627, 651 (Mo. App. W.D. 2014)). "Evidence is logically relevant if it make[s] the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quoting *Mansfield*, 443 S.W.3d at 651). "Legal relevance, on the other hand, concerns the balance between the probative value and the prejudicial effect of the evidence." *Id.* (quoting *Mansfield*, 443 S.W.3d at 651). "That balancing requires the trial court to weigh the probative value, or usefulness, of the evidence against its costs, specifically the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence." *Id.* (quoting *Mansfield*, 443 S.W.3d at 651 (internal quotation omitted)). "If the cost of the evidence outweighs its usefulness, the evidence is not legally relevant and should be excluded." *Id.* (quoting *Mansfield*, 443 S.W.3d at 651).

"The trial court has broad discretion in determining whether to admit or exclude evidence." *Ferguson v. Curators of Lincoln Univ.*, 498 S.W.3d 481, 489 (Mo.

---

**6.** Though we need not reach the issue in this case, as it was not raised, parties should be mindful in future cases that "[s]ection 213.111.1, RSMo Supp. 2013, of the Missouri Human Rights Act (MHRA), requires the Missouri Commission on Human Rights (MCHR) to issue a right-to-sue letter and terminate all proceedings related to a complaint if 180 days have elapsed [since the filing of the charge of discrimination] and the employee has made a written request for a right-to-sue letter." *State*

*ex rel. Tivol Plaza, Inc. v. Mo. Comm'n on Human Rights*, 527 S.W.3d 837, 839 (Mo. banc 2017). Once those conditions have been met, "the MCHR los[es] authority to continue processing the charges." *Id.* Thus, where additional acts of discrimination or retaliation occur after 180 days have elapsed and a right-to-sue letter has issued, as was the case here, there is a possibility that the MCHR will lack the authority to address them. But this is an issue we need not decide in this appeal.

App. W.D. 2016) (quoting *State v. Johnson*, 477 S.W.3d 218, 226 (Mo. App. W.D. 2015)). "Thus, we review the trial court's decisions regarding the admission of evidence for an abuse of discretion." *Id.* (quoting *Johnson*, 477 S.W.3d at 226). "The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (quoting *Johnson*, 477 S.W.3d·at 226).

 "To pursue a claim of evidentiary error on appeal, a party must do four things, two at the trial court and two on appeal." *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 452 n.4 (Mo. banc 2014). "First, the party must raise the claimed error in a timely fashion, which means (when the claim is that the trial court improperly excluded evidence) that the proponent must offer the evidence at trial and make a detailed offer of proof concerning that evidence when the trial court orders that it be excluded." *Id.* "Second, the party must preserve that claim by including it ·in its motion for a new trial." *Id.* "Third, the party must present this claim in a proper point relied on in the appellate brief." *Id.* "Finally, the party must provide a sufficient argument on that point in the party's brief." *Id.* Failure to meet any of these four requirements results in a lack of preservation and could lead to the denial of review of the claim on appeal.

### 1. The 2007 Voicemail and Inappropriate Comments

 In its second and third points on appeal, MVC argues that the court erred in excluding from evidence both a voicemail left by Kerr for Kay in which she told Kay she loved him and testimony about inappropriate sexual comments allegedly made by Kerr to Kay in the same time-frame and Kay's reaction to those comments. A brief procedural history is necessary to understand the points.

The voicemail and the comments were subjects of a pre-trial motion in limine by Kerr, seeking their exclusion. Kerr argued that this evidence was irrelevant to the issues in the case insofar as MVC never alleged that she was terminated for misconduct and she was not pursuing a hostile work environment claim.

MVC argued that "the voice mail tape from 2007 goes directly to not only Ms. Kerr's motivation [to file the lawsuit] but also to the relationship between she and Larry Kay." MVC contended that the voicemail supported its theory that Kerr's motivation for filing suit was because Kay spurned her alleged romantic interest in him and that the statements in the voicemail would contradict her testimony that Kay treated her harshly. The trial court agreed with Kerr that "it doesn't make a difference [what] her motive [was] for filing as long as there's a plausible case," but disagreed with Kerr's assertion that her statements lacked relevance, noting, "what she says I think probably is relevant to a complete picture of what it is." Accordingly, the court denied Kerr's motion in limine with respect to the voicemail.

As for the sexual comments, MVC argued that the comments were relevant to attack Kerr's credibility and that Kay's reaction to them was relevant to rebut evidence that Kay harbored animus against Kerr. The court likewise denied the motion in limine regarding the comments.

During its cross-examination of Kerr, MVC asked Kerr about both the sexual comments and the voicemail, first questioning whether she had ever gone into Kay's office and spoke with him about using a battery-operated device in her sex-

ual life with her husband. Kerr denied making the comments. MVC then asked Kerr if she had ever called Kay and asked him questions about oral sex. Kerr again denied that she had. MVC then asked Kerr if she had ever left Kay a voicemail telling him that she loved him. Kerr admitted doing so. MVC also asked Kerr if, in the same voicemail, she also said that she told her husband that she loved Kay. Again, Kerr admitted that she had.

During the defense case, MVC sought to present the deposition of Kim Harris, MVC's human resources director, to testify regarding Kerr's sexually inappropriate comments as part of an overall effort to paint Kerr as a scorned woman seeking revenge and to show that Kay did not retaliate against Kerr when he had the opportunity to. Kerr objected, arguing that the evidence was all collateral and would lead the jury astray from the actual issues in the case.[7] The court sustained the objection on the ground that the potential prejudice outweighed the probative value of the evidence, but left the matter open for a later offer of proof.

▪ Near the close of evidence, MVC made an offer of proof regarding the sexual comments and the voicemail. According to the offer of proof, *Kay* would have testified that, during the summer of 2007, Kerr made inappropriate sexual comments to him, prompting Kay to contact Harris and report the matter.[8] He also would have testified that when Harris asked if Kay would like to file a complaint, he declined, asking instead that Harris simply address the issue with Kerr. According to the offer of proof, Harris held a meeting with both Kay and Kerr wherein they addressed the alleged comments and Kerr admitted to making them. Two weeks later, Kerr left the voicemail at issue, which—according to the offer of proof—prompted Kay to again seek out Harris's assistance but decline to file a formal complaint. As part of its offer of proof, MVC offered Exhibits 1788 (the voicemail recording) and 1789 (a transcript of the recording).[9] In its motion for new trial, however, MVC addressed only the 2007 voicemail and made no references to the inappropriate sexual comments. Rule 78.07(a) requires that, "[i]n jury tried cases, except as otherwise provided in this Rule 78.07, allegations of error must be included in a motion for a new trial in order to be preserved for appellate review." Accordingly, MVC's claim regarding the sexual comments is not preserved for review, and we will not address it.[10]

7. It appears that the problem arose because Harris was unable to testify in person as the parties had anticipated; thus, they turned to her deposition testimony. Though the parties were attempting to avoid addressing any matters touching on a hostile work environment in light of the fact that Kerr had elected not to pursue that claim, the questions posed in Harris's deposition were crafted with a hostile work environment claim in mind; the crafting of the deposition questions prompted the sidebar discussion and offer of proof.

8. Curiously, MVC made no effort to ask Kay about either the sexual comments or the voicemail during his testimony. Nor did MVC call Kay to testify during the offer of proof, even though much of the offer of proof fo-

cused on what Kay would have testified to, rather than testimony from Harris's deposition.

9. According to the transcript, the exhibits offered were numbered 78 and 79, rather than 1788 and 1789. MVC asserts that this is merely a transcription error. Kerr does not challenge this assertion; thus, we will accept exhibits 1788 and 1789 as the originals offered at trial during MVC's offer of proof.

10. MVC argues that these claims were included in the motion for new trial when MVC challenged exclusion of Kerr's "admission to a former colleague." We do not find this assertion to encompass the evidence presented in the offer of proof regarding sexual com-

Though MVC argued below that the 2007 voicemail was relevant to both Kerr's motivation to bring suit and to the issue of any animus harbored by Kay, MVC's second point relied on focuses solely on the relevance of the voicemail to Kerr's motivation to file suit. Thus, we limit our discussion to that issue.

In response to this argument below, the trial court correctly noted that "it doesn't make a difference [what] her motive [was] for filing as long as there's a plausible case." *See, e.g., Honey Creek Drainage Dist. v. Farm City Inv. Co.*, 326 Mo. 739, 32 S.W.2d 753, 758 (Mo. 1930) (holding that, where "petitioners[,] in commencing and prosecuting [a lawsuit] did what they had a legal right to do[, t]heir hidden motive or purpose in so doing was without relevance."); *State ex rel. L.B. v. Frawley*, 136 S.W.3d 534, 536 (Mo. App. E.D. 2004) (holding that a party's motive in seeking a change of judge as a matter of right was irrelevant because she was entitled to do so under the law); *Greentree Props., Inc. v. Kissee*, 92 S.W.3d 289, 295 n.5 (Mo. App. S.D. 2002) (holding that, "if there has been a material breach of the contract which entitles the party to rescind the contract, then the motive of the party [in seeking rescission] is immaterial"). Thus, the voicemails were not logically relevant.

Points II and III are denied.

## 2. Relationship Evidence

In its fourth point on appeal, MVC argues that evidence of the 2007 voicemail, the sexual comments, and various Skype messages contained within Exhibits 1500 and 1501 were all relevant to demonstrate Kerr's romantic interest in Kay and thereby contradict her allegedly "misleading narrative ... regarding her work relationship with Director Kay and the MVC."

As noted above, MVC's motion for new trial included no complaints regarding the exclusion of the sexual comments. Thus, we will not review that aspect of this claim. *Lozano*, 421 S.W.3d at 452 n.4. MVC also admits that it did not offer any of the Skype messages contained within Exhibit 1500 into evidence. Accordingly, those messages also are not properly before us for review. *Id.* With respect to Exhibit 1501, MVC initially offered the entire exhibit into evidence, but the court declined to accept the 28-page document without MVC first establishing the purpose for its admission. After some brief discussion, the parties agreed that MVC would use Exhibit 1501 to impeach Kerr's testimony if she were to testify inconsistently with any of the statements she made within the exhibit. MVC makes no complaint regarding its permitted use of Exhibit 1501 in this manner. MVC later sought to admit one page of Exhibit 1501, marked as Exhibit 1501-B, during Kay's testimony. But MVC has not filed Exhibit 1501-B with us as part of the record on appeal; thus, we cannot discern which one of the twenty-eight pages comprising Exhibit 1501 was offered and refused during Kay's testimony. As such, we are left with nothing more to review than a complaint that the 2007 voicemail was improperly excluded, as it was purportedly relevant to contradict Kerr's allegedly "misleading narrative ... regarding her work relationship with Director Kay and the MVC."

ments, as the reference in the motion for new trial couched this prior admission as "similar" to Kerr's professions of love in the voicemail. MVC has not requested plain error review, and we are not inclined to grant it. Even if preserved, we would find this point

without merit, as Kay's motivation for declining to file a formal complaint against Kerr lacks legal relevance. Whatever slight probative value the evidence might have had was outweighed by the prejudice it would have inflicted on Kerr.

As discussed above, within the voicemail, Kerr tells Kay that she loves him and indicates that she told her husband she loved Kay. When confronted with these statements at trial, Kerr acknowledged making both of them. Though MVC elaborates in its brief how it believes the sexual comments and the Skype messages contradicted Kerr's allegedly misleading narrative, it does not give the same treatment to the 2007 voicemail. The argument section of MVC's Point IV does nothing more with the 2007 voicemail than identify its content and claim that it was improperly excluded. Without any legal support for this argument, MVC has effectively abandoned it, and we are left with nothing to review. *Carlisle v. Rainbow Connection, Inc.*, 300 S.W.3d 583, 585 (Mo. App. E.D. 2009) ("If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned.").

For all of the reasons laid out above, Point IV is denied.

**C. MVC failed to preserve any objection to the admission of "me too" evidence.**

■■■■ In its final point on appeal, MVC argues that the court erred in admitting "me too" evidence from various soldiers deployed with Kay in Kosovo because it was unfairly prejudicial. But, because MVC failed to object to the admission of any of this evidence, we decline to review this point.

During trial, Kerr presented testimony from numerous female soldiers who had been deployed to Kosovo and served under Kay. These soldiers testified that Kay berated and belittled them, and they further testified to instances where Kay removed high-ranking women from their positions and replaced them with men. Though MVC sought to exclude this evidence in a pre-trial motion in limine, that motion was denied and MVC failed to object when any of the evidence was actually presented at trial.

■■■■ "To preserve an issue that evidence was improperly admitted, it is not enough for a party to rely solely on the ruling denying a motion in limine[;] ... [a] motion in limine, by itself, preserves nothing for appeal." *Wilkins v. Bd. of Regents of Harris-Stowe State Univ.*, 519 S.W.3d 526, 541 (Mo. App. E.D. 2017) (internal quotations omitted). "After the denial of its motion in limine, a party 'is required to object at trial to the introduction of the evidence and to reassert the objection in post-trial motions.'" *Id.* (quoting *Marquis Fin. Servs. of Ind. v. Peet*, 365 S.W.3d 256, 260 (Mo. App. E.D. 2012)). "Where evidence is admitted without objection, 'the party against whom it is offered waives any objection to the evidence, and it may be properly considered even if the evidence would have been excluded upon a proper objection.'" *Id.* (quoting *Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 106 (Mo. App. W.D. 2015)). "An appellant's failure to preserve an issue at the trial court waives the issue, and it is not reviewable on appeal." *Ryan v. Maddox*, 112 S.W.3d 476, 479 (Mo. App. W.D. 2003). MVC has not sought plain error review, and we are not inclined to grant it.

Point V is denied.

### Conclusion

■■■■ The trial court did not err in allowing the jury to consider the Odessa incident in determining whether MVC engaged in retaliation against Kerr. Additionally, MVC has failed to carry its burden of demonstrating error in either the exclusion or the admission of any of the evidence it identifies. The trial court's

judgment is affirmed.[11] We remand to the trial court to determine the appropriate amount of appellate attorney fees to be awarded to Kerr's counsel.

Cynthia L. Martin, Presiding Judge, and James Edward Welsh, Judge, concur.

11. Kerr filed a motion requesting attorney fees and costs on appeal. "Section 213.111.2 authorizes the court to award court costs and reasonable attorney fees to a prevailing party." *Walsh v. City of Kansas City*, 481 S.W.3d 97, 115 (Mo. App. W.D. 2016). "A 'prevailing party' includes one who prevails in an action brought under the MHRA, is awarded attorney fees by the trial court, and who successfully defends that favorable judgment on appeal." *Id.* Because MVC's liability for Kerr's MHRA claims was affirmed on appeal, Kerr is the prevailing party. We therefore grant Kerr's request for reasonable attorney fees and costs and remand to the trial court to both determine the reasonableness of the sums requested and enter an appropriate award.